## LATHROP *v.* DONOHUE.

No. 200.   Argued January 18, 1961.—Decided June 19, 1961.

*Trayton L. Lathrop* and *Leon E. Isaksen* argued the cause and filed a brief for appellant.

*John W. Reynolds,* Attorney General of Wisconsin, and *Gordon Sinykin* argued the cause for appellee.   With them on the brief was *Warren H. Resh,* Assistant Attorney General.

Briefs of *amici curiae,* urging affirmance, were filed by *Herbert D. Sledd, William H. King* and *Edward R. Baird* for the Kentucky State Bar Association and the Virginia State Bar; *Albert E. Blashfield* and *J. Cameron Hall* for the State Bar of Michigan; *Herman F. Selvin, Eugene M. Prince* and *Burnham Enersen* for the State Bar of California; *John M. Dalton,* Attorney General, for the State of Missouri; *Charles B. Blackmar* for the Missouri Bar; *Clyde Atkins, Charles B. Fulton* and *J. Lewis Hall* for the Florida Bar; *Wade Church,* Attorney General, for the State of Arizona; *J. Blaine Anderson* for the State of Idaho; *Robert Y. Thornton,* Attorney General, and *Dean F. Bryson* for the State of Oregon; *Walter L. Budge,* Attorney General, and *George S. Ballif* for the State of Utah; *Norman B. Gray,* Attorney General, and *John P. Ilsley* for the State of Wyoming; *W. W. Barron,* Attorney General, *Fred H. Caplan,* Assistant Attorney General, *Stanley E. Dadisman, C. E. Goodwin* and *Charles C. Wise, Jr.* for the State of West Virginia; and *Cecil E. Burney, Bernard G. Segal, James C. Dezendorf, Philip C. Ebeling, Erwin N. Griswold* and *Edward W. Kuhn* for the American Judicature Society.

*Leo Rattay* and *Edwin F. Woodle* filed a brief for the Cuyahoga County Bar Association, as *amicus curiae,* urging reversal.

MR. JUSTICE BRENNAN announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE CLARK and MR. JUSTICE STEWART join.

The Wisconsin Supreme Court integrated the Wisconsin Bar by an order which created "The State Bar of Wisconsin" on January 1, 1957, under Rules and Bylaws promulgated by the court. *In re Integration of the Bar,* 273 Wis. 281; *id.,* p. vii; 77 N. W. 2d 602. The order originally was effective for a two-year trial· period, but

in 1958 was continued indefinitely. *In re Integration of the Bar,* 5 Wis. 2d 618, 93 N. W. 2d 601. Alleging that the "rules and by-laws required the plaintiff to enroll in the State Bar of Wisconsin and to pay dues to the treasurer of the State Bar of Wisconsin on the penalty of being deprived of his livelihood as a practicing lawyer, if he should fail to do so," the appellant, a Wisconsin lawyer, brought this action in the Circuit Court of Dane County for the refund of $15 annual dues for 1959 paid by him under protest to appellee, the Treasurer of the State Bar. He attached to his complaint a copy of the letter with which he had enclosed his check for the dues. He stated in the letter that he paid under protest because "I do not like to be coerced to support an organization which is authorized and directed to engage in political and propaganda activities. . . . A major portion of the activities of the State Bar as prescribed by the Supreme Court of Wisconsin are of a political and propaganda nature." His complaint alleges more specifically that the State Bar promotes "law reform" and "makes and opposes proposals for changes in . . . laws and constitutional provisions and argues to legislative bodies and their committees and to the lawyers and to the people with respect to the adoption of changes in . . . codes, laws and constitutional provisions." He alleges further that in the course of this activity "the State Bar of Wisconsin has used its employees, property and funds in active, unsolicited opposition to the adoption of legislation by the Legislature of the State of Wisconsin, which was favored by the plaintiff, all contrary to plaintiff's convictions and beliefs." His complaint concludes: "The plaintiff bases this action on his claim that the defendant has unjustly received, held, and disposed of funds of the plaintiff in the amount of $15.00, which to the knowledge of the

defendant were paid to the defendant by the plaintiff unwillingly and under coercion, and that such coercion was and is entailed in the rules and by-laws of the State Bar of Wisconsin continued in effect by the aforesaid order of the Supreme Court of the State of Wisconsin . . . ; and the said order insofar as it coerces the plaintiff to support the State Bar of Wisconsin, is unconstitutional and in violation of the Fourteenth Amendment of the Constitution of the United States . . . ."

The appellee demurred to the complaint on the ground, among others,[1] that it failed to state a cause of action. The demurrer was sustained and the complaint was dismissed. The Supreme Court of Wisconsin, on appeal, stated that the Circuit Court was without jurisdiction to determine the questions raised by the complaint. However, treating the case as if originally and properly brought in the Supreme Court, the court considered appellant's constitutional claims, not only on the allegations of the complaint, but also upon the facts, of which it took judicial notice, as to its own actions leading up to the challenged order, and as to all activities, including legislative activities, of the State Bar since its creation.[2] The judgment of the Circuit Court dismissing the complaint was affirmed. 10 Wis. 2d 230, 102 N. W. 2d 404. The Supreme Court held that the requirement that appellant be an enrolled dues-paying member of the State Bar did not abridge his rights of freedom of association, and also that his rights to free speech were not violated because the State Bar used his money to support legislation with which he disagreed.

---

[1] He also demurred on grounds that the Circuit Court had no jurisdiction of the subject matter because exclusive jurisdiction was vested in the Supreme Court and that there was a defect of parties because the State Bar was not made a defendant.

[2] We also consider the case on this expanded record. Appellant raises no objection, and indeed urges us to do so.

An appeal was brought here by appellant under 28 U. S. C. § 1257 (2), which authorizes our review of a final judgment rendered by the highest court of a State "By appeal, where is drawn in question the validity of a [state] statute . . . ." We postponed to the hearing on the merits the question whether the order continuing the State Bar indefinitely under the Rules and Bylaws is a "statute" for the purposes of appeal under § 1257 (2). 364 U. S. 810.

We think that the order is a "statute" for the purposes of § 1257 (2). Under that section, the legislative character of challenged state action, rather than the nature of the agency of the State performing the act, is decisive of the question of jurisdiction. It is not necessary that the state legislature itself should have taken the action drawn in question. In construing the similar jurisdictional provision in the Judiciary Act of 1867, 14 Stat. 385, we said: "Any enactment, from whatever source originating, to which a State gives the force of law is a statute of the State, within the meaning of the clause cited relating to the jurisdiction of this court." *Williams* v. *Bruffy,* 96 U. S. 176, 183. We likewise said of the provision of the Act of 1925, 43 Stat. 936, which is the present § 1257 (2): ". . . the jurisdictional provision uses the words 'a statute of any State' in their larger sense and is not intended to make a distinction between acts of a state legislature and other exertions of the State's law-making power, but rather to include every act legislative in character to which the State gives its sanction." *King Manufacturing Co.* v. *City Council,* 277 U. S. 100, 104–105. Thus this Court has upheld jurisdiction on appeal of challenges to municipal ordinances, *e. g., King Manufacturing Co.* v. *City Council, supra; Jamison* v. *Texas,* 318 U. S. 413; certain types of orders of state regulatory commissions, *e. g., Lake Erie & Western R. Co.* v. *State Public Utilities Comm'n,* 249 U. S. 422; and some

orders of other state agencies, *e. g., Hamilton* v. *Regents,* 293 U. S. 245, 257–258. It is true that in these cases the state agency the action of which was called in question was exercising authority delegated to it by the legislature. However, this fact was not determinative, but was merely relevant to the character of the State's action. The absence of such a delegation does not preclude consideration of the exercise of authority as a statute.

We are satisfied that this appeal is from an act legislative in nature and within § 1257 (2). Integration of the Bar was effected through an interplay of action by the legislature and the court directed to fashioning a policy for the organization of the legal profession. The Wisconsin Legislature initiated the movement for integration of the Bar in 1943 when it passed the statute, chapter 315 of the Wisconsin Laws for that year, now Wis. Rev. Stat. § 256.31, providing:

> "(1) There shall be an association to be known as the 'State Bar of Wisconsin' composed of persons licensed to practice law in this state, and membership in such association shall be a condition precedent to the right to practice law in Wisconsin.
>
> "(2) The supreme court by appropriate orders shall provide for the organization and government of the association and shall define the rights, obligations and conditions of membership therein, to the end that such association shall promote the public interest by maintaining high standards of conduct in the legal profession and by aiding in the efficient administration of justice."

The State Supreme Court held that this statute was not binding upon it because "[t]he power to integrate the bar is an incident to the exercise of the judicial power . . . ." *Integration of Bar Case,* 244 Wis. 8, 40, 11 N. W. 2d 604, 619. The court twice refused to order integration, 244

Wis. 8, 11 N. W. 2d 604, 249 Wis. 523, 25 N. W. 2d 500, before taking the actions called in question on this appeal, 273 Wis. 281, 77 N. W. 2d 602, 5 Wis. 2d 618, 93 N. W. 2d 601. Nevertheless, the court in rejecting the first petition, 244 Wis., at pp. 51–52, 11 N. W. 2d, at pp. 623–624, recognized that its exercise of the power to order integration of the Bar would not be adjudicatory, but an action in accord with and in implementation of the legislative declaration of public policy.[3] The court said:

> "It is obvious that whether the general welfare requires that the bar be treated as a corporate body is a matter for the consideration of the legislature. . . . While the legislature has no constitutional power to compel the court to act or, if it acts, to act in a particular way in the discharge of the judicial function, it may nevertheless with propriety, and in the exercise of its power and the discharge of its duty, declare itself upon questions relating to the general welfare which includes the integration of the bar. The court, as has been exemplified during the entire history of the state, will respect such decla-

---

[3] The court's action was in response to a petition for "integration . . . in the manner described" in Wis. Rev. Stats. § 256.31. Wis. Bar Bull., Apr. 1956, p. 21. The resolution of the House of Governors of the Wisconsin Bar Association leading to the filing of the petition referred to "integration . . . pursuant to the provisions of Section 256.31 of the Wisconsin Statutes." *Id.*, p. 52. In many other States integration was initially accomplished either entirely by the legislature or by a combination of legislative and judicial action. See N. D. Laws 1921, c. 25; Ala. Laws 1923, No. 133; Idaho Laws 1923, c. 211; N. M. Laws 1925, c. 100; Cal. Stat. 1927, c. 34; Nev. Stat. 1928, c. 13; Okla. Laws 1929, c. 264; Utah Laws 1931, c. 48; S. D. Laws 1931, c. 84; Ariz. Laws 1933, c. 66; Wash. Laws 1933, c. 94; N. C. Laws 1933, c. 210; La. Acts 1934, 2d Extra Sess., No. 10; Ky. Acts 1934, c. 3; Ore. Laws 1935, c. 28; Mich. Acts 1935, No. 58; Va. Acts 1938, c. 410; Tex. Gen. Laws 1939, p. 64; W. Va. Acts 1945, c. 44; Alaska Laws 1955, c. 196.

rations and, as already indicated, adopt them so far as they do not embarrass the court or impair its constitutional functions."

Integration of the Bar in Wisconsin bore no resemblance to adjudication. The State Supreme Court's action disposed of no litigation between parties. Rather the court sought to regulate the profession by applying its orders to all present members of the Bar and to all persons coming within the described class in the future. Cf. *Hamilton* v. *Regents, supra,* p. 258; *King Manufacturing Co.* v. *City Council, supra,* p. 104. As such, the action had the characteristics of legislation. We conclude that the appeal is cognizable under § 1257 (2). We therefore proceed to the consideration of the merits.

The core of appellant's argument is that he cannot constitutionally be compelled to join and give support to an organization which has among its functions the expression of opinion on legislative matters and which utilizes its property, funds and employees for the purposes of influencing legislation and public opinion toward legislation.[4] But his compulsory enrollment imposes only

---

[4] Appellant's notice of appeal presents the following question for our review:

"Do the orders and rules of the Supreme Court of the State of Wisconsin . . . and the rules and by-laws which were promulgated thereby deprive the appellant . . . of his rights of freedom of association, assembly, speech, press, conscience and thought, or of his liberty or property without due process of law or deny to him equal protection of the law or otherwise deprive him of rights under the Fourteenth Amendment of the Constitution of the United States by compelling him, as a condition to his right to continue to practice law in the State of Wisconsin, to be a member of and financially support an association of attorneys known as the State Bar of Wisconsin, which association . . . among other things, uses its property, funds and employees for the purpose of influencing a broad range of legislation and public opinion; and, therefore, are said orders,

the duty to pay dues.[5]   The Supreme Court of Wisconsin so interpreted its order and its interpretation is of course binding on us.   The court said: "The rules and by-laws of the State Bar, as approved by this court, do not compel the plaintiff to associate with anyone.   He is free to attend or not attend its meetings or vote in its elections as he chooses.   The only compulsion to which he has been subjected by the integration of the bar is the payment of the annual dues of $15 per year."   10 Wis. 2d, at p. 237, 102 N. W. 2d, at p. 408.[6]   We therefore are confronted, as we were in *Railway Employes' Department* v. *Hanson,* 351 U. S. 225, only with a question of compelled financial support of group activities, not with involuntary membership in any other aspect.   Cf. *International Association of Machinists* v. *Street,* decided today, *ante,* p. 740, at pp. 748–749.

A review of the activities of the State Bar authorized under the Rules and Bylaws is necessary to decision. The purposes of the organization are stated as follows in Rule 1, § 2: "to aid the courts in carrying on and improv-

---

rules and by-laws, insofar as they coerce the appellant to be a member of and support said association, invalid on the ground that they are repugnant to the Constitution of the United States?"

[5] The rules limit the maximum permissible dues to $20 a year.

[6] A member suspended for nonpayment of dues may secure automatic reinstatement, so long as his dues are not in arrearage for three or more years, by making full payment of the amount and paying an additional $5 as a penalty. No other condition on acquiring or retaining membership is imposed by the rules or bylaws. Although the State Bar participates in the investigation of complaints of misconduct, see pp. 829–832, *infra,* final power to disbar or otherwise discipline any member resides in the Supreme Court.

The rules also make the canons of ethics of the American Bar Association, as modified or supplemented by the Supreme Court of Wisconsin, "the standards governing the practice of law in this state." But appellant makes no claim that the State lacks power to impose on him a duty to abide by these canons.

ing the administration of justice; to foster and maintain on the part of those engaged in the practice of law high ideals of integrity, learning, competence and public service and high standards of conduct; to safeguard the proper professional interests of the members of the bar; to encourage the formation and activities of local bar associations; to provide a forum for the discussion of subjects pertaining to the practice of law, the science of jurisprudence and law reform, and the relations of the bar to the public, and to publish information relating thereto; to the end that the public responsibilities of the legal profession may be more effectively discharged." To achieve these purposes standing committees and sections are established.[7] The Rules also assign the organization

---

[7] The committees and their assigned functions are as follows:

*"Legal education and bar admissions.*—This committee shall make continuing studies of the curricula and teaching methods employed in law schools, and of standards and methods employed in determining the qualifications of applicants for admission to the bar; and whenever requested by the State Bar commissioners shall assist in the investigation of the qualifications of persons seeking admission to the bar.

*"Post-graduate education.*—This committee shall formulate and promote programs designed to afford to the members of the State Bar suitable opportunities for acquiring additional professional knowledge, training, and skill, through publications, lectures, and discussions at regional meetings of association members and law institutes, and through correspondence course study.

*"Administration of justice.*—This committee shall study the organization and operation of the Wisconsin judicial system and shall recommend from time to time appropriate changes in practice and procedure for improving the efficiency thereof; and in that connection shall examine all legislative proposals for changes in the judicial system.

*"Judicial selection.*—This committee shall study and collect information pertaining to judicial selection, tenure, and compensation, including retirement pensions, and shall report from time to time to the association with respect thereto.

*"Professional ethics.*—This committee shall formulate and recommend standards and methods for the effective enforcement of high

a major role in the State's procedures for the discipline of members of the bar for unethical conduct. A Committee on Grievances is provided for each of the nine districts into which the State is divided. Each

standards of ethics and conduct in the practice of law; shall consider the Canons of Ethics of the legal profession and the observance thereof, and shall make recommendations for appropriate amendments thereto. The committee shall have authority to express opinions regarding proper professional conduct, upon written request of any member or officer of the State Bar.

*"Public services.*—This committee shall prepare and present to the board of governors plans for advancing public acceptance of the objects and purposes of the association; and shall have responsibility for the execution of such plans as are approved by the board of governors. Such plans shall include arrangements for disseminating information of interest to the public in relation to the functions of the departments of government, the judicial system and the bar; and to that end the committee may operate a speakers' bureau and employ the facilities of the public press and other channels of public communications.

*"Interprofessional and business relations.*—It shall be the duty of this committee to serve as a liaison agency between the legal profession and other professions and groups with whom the bar is in contact in order to interpret to such professions and groups the proper scope of the practice of law.

*"Legislation.*—This committee shall study all proposals submitted to the Wisconsin legislature or the congress of the United States for changes in the statutes relating to the courts or the practice of law, and shall report thereon to the board of governors; and with the approval of the board of governors may represent the State Bar in supporting or opposing any such proposals.

*"Legal aid.*—This committee shall promote the establishment and efficient maintenance of legal aid organizations equipped to provide free legal services to those unable to pay for such service; shall study the administration of justice as it affects persons in the low income groups; and shall study and report on methods of making legal service more readily available to persons of moderate means, and shall encourage and assist local bar associations in accomplishing this purpose.

*"Unauthorized practice of the law.*—This committee shall keep itself and the association informed with respect to the unauthorized

committee receives and investigates complaints of alleged misconduct of lawyers within its district. Each committee also investigates and processes petitions for reinstatement of lawyers and petitions for late enrollment in the State Bar of lawyers who fail to enroll within a designated period after becoming eligible to enroll.

The State Legislature and the State Supreme Court have informed us of the public interest sought to be served by the integration of the bar. The statute states its desirability "to the end that such association shall promote the public interest by maintaining high stand-

---

practice of law by laymen and by agencies, and the participation of members of the bar in such activities, and concerning methods for the prevention thereof. The committee shall seek the elimination of such unauthorized practice and participation therein on the part of members of the bar, by such action and methods as may be appropriate for that purpose.

"*State Bar Bulletin.*—This committee shall assist and advise the officers of the association and the board of governors in matters pertaining to the production and publication of the *Wisconsin State Bar Bulletin,* the *Wisbar Letter,* the *Supreme Court Calendar Service* and such other periodical publications of the State Bar as may be authorized by the board of governors from time to time.

"*State Grievance Committee.*—This committee shall consist of the chairmen of the district grievance committees, who shall meet at least quarterly and whose duties shall be to exchange information as to problems arising under the grievance procedure, to discuss and adopt uniform procedures and standards under Rule 10 [relating to grievances] and to make recommendations to the Board of Governors for improvements in the procedures under Rule 10 and for other matters consistent with their organization." Article IV, Sections 2–13, 273 Wis. xxxiii-xxxv; Supplement, Wis. Bar Bull., Aug. 1960, pp. 21–23.

Sections have been created in the areas of corporation and business law, family law, role of house counsel, insurance, negligence and workmen's compensation law, labor relations law, military law, real property, probate and trust law, taxation, government law, protection of individual rights against misuse of powers of government, patent, trademark and copyright law, and criminal law.

ards of conduct in the legal profession and by aiding in the efficient administration of justice." This theme is echoed in the several Supreme Court opinions. The first opinion after the passage of the statute noted the "widespread general recognition of the fact that the conduct of the bar is a matter of general public interest and concern." 244 Wis. 8, 16, 11 N. W. 2d 604, 608. But the court's examination at that time of existing procedures governing admission and discipline of lawyers and the prevention of the unauthorized practice of the law persuaded the court that the public interest was being adequately served without integration. The same conclusion was reached when the matter was reviewed again in 1946. At that time, in addition to reviewing the desirability of integration in the context of the problems of admission and discipline, the court considered its utility in other fields. The matter of post-law school or post-admission education of lawyers was one of these. The court believed, however, that while an educational program was a proper objective, the one proposed was "nebulous in outline and probably expensive in execution." 249 Wis. 523, 530, 25 N. W. 2d 500, 503. The court also observed, "There are doubtless many other useful activities for which dues might properly be used, but what they are does not occur to us and no particular one seems to press for action." 249 Wis. 523, 530, 25 N. W. 2d 500, 503.

The court concluded in 1956, however, that integration might serve the public interest and should be given a two-year trial.[8] It decided to "require the bar to act as

---

[8] The court said: "We feel . . . that integration of the bar should be tried. The results thereof will be what the bar and the court make of it. If integration does not work, this court can change the rules to meet any situation that arises or it can abandon the plan." *In re Integration of the Bar,* 273 Wis. 281, 285, 77 N. W. 2d 602, 604. "[The rules and by-laws] cannot be taken as the last word, and . . . experience in operating under them may disclose imperfections, and

a unit to promote high standards of practice and the economical and speedy enforcement of legal rights," 273 Wis. 281, 283, 77 N. W. 2d 602, 603, because it had come to the conclusion that efforts to accomplish these ends in the public interest through voluntary association had not been effective. "[T]oo many lawyers have refrained or refused to join, . . . membership in the voluntary association has become static, and . . . a substantial minority of the lawyers in the state are not associated with the State Bar Association." 273 Wis. 281, 283, 77 N. W. 2d 602, 603. When the order was extended indefinitely in 1958 the action was expressly grounded on the finding that, "Members of the legal profession by their admission to the bar become an important part of [the] process [of administering justice] . . . . An independent, active, and intelligent bar is necessary to the efficient administration of justice by the courts." 5 Wis. 2d 618, 622, 93 N. W. 2d 601, 603.

The appellant attacks the power of the State to achieve these goals through integration on the ground that because of its legislative activities, the State Bar partakes of the character of a political party. But on their face the purposes and the designated activities of the State Bar hardly justify this characterization. The inclusion among its purposes that it be a forum for a "discussion of . . . law reform" and active in safeguarding the "proper professional interests of, the members of the bar," in unspecified ways, does not support it. Only two of the 12 committees, Administration of Justice, and Legislation, are expressly directed to concern themselves in a substantial way with legislation. Authority granted the other committees directs them to deal largely with matters

particulars in which they should be changed. The integrated bar itself is an experiment in Wisconsin, and like all new enterprises may be expected to need adaptation to conditions and circumstances not yet clearly foreseen." 273 Wis. ix.

which appear to be wholly outside the political process and to concern the internal affairs of the profession.

We do not understand the appellant to contend that the State Bar is a sham organization deliberately designed to further a program of political action. Nor would such a contention find support in this record. Legislative activity is carried on under a statement of policy which followed the recommendations of a former president of the voluntary Wisconsin Bar Association, Alfred La-France. He recommended that the legislative activity of the State Bar should have two distinct aspects: (1) "the field of legislative reporting or the dissemination of information concerning legislative proposals. . . . This is a service-information function that is both useful to the general membership and to the local bar associations"; and (2) "promotional or positive legislative activity." As to the latter he advised that "the rule of substantial unanimity should be observed. Unless the lawyers of Wisconsin are substantially for or against a proposal, the State Bar should neither support nor oppose the proposal." Wis. Bar Bull., Aug. 1957, pp. 41–42. "We must remember that we are an integrated Bar, that the views of the minority must be given along with the views of the majority where unanimity does not appear. The State Bar represents all of the lawyers of this state and in that capacity we must safeguard the interests of all." *Id.*, p. 44. The rules of policy and procedure for legislative activity follow these recommendations.[9]

---

[9] The policy provides:

1. "The State Bar, through action of its Board of Governors, will initiate legislation only on such matters as it believes to be of general professional interest. No legislation will be sponsored unless and until the Board is satisfied that the recommendation represents the consensus and the best composite judgment of the legal profession of this state, and that the proposed legislation is meritorious and in the public interest. The text of all proposed legislation shall be

Under its charter of legislative action, the State Bar has participated in political activities in these principal categories:

(1) its executive director is registered as a lobbyist in accordance with state law. For the legis-

carefully prepared and considered and the counsel of the experts in the field involved will be sought wherever possible."

2. Power to make the final determination of the policy of the State Bar toward specific legislative proposals is lodged in the Board of Governors.

3. "Where it is obvious that the membership of the Bar is of a substantially divided opinion, the Board of Governors shall take no definite position"; but in any such case the Board is empowered to report its vote to the Legislature as a reflection of the diverse views of the members.

4. The Board may delegate its power to take a position on legislative matters to the Committee on Legislation, the president of the State Bar, or the legislative counsel.

5. Between Board meetings, the Executive Committee may exercise all of the Board's powers with respect to legislation.

6. The Board shall designate a legislative counsel, to be registered as a lobbyist in accordance with Wisconsin law. His task is to manage legislative activities, coordinating the work of sections and committees interested in legislative proposals with the activities of the Board, Executive Committee, and Committee on Legislation; he is also directed to screen all legislative proposals and refer those of special interest to the appropriate section or committee for study and recommendation.

7. The Committee on Legislation is empowered to designate persons to appear before legislative committees and arrange for their appearance.

8. When a section or committee sponsors legislation with the aproval of the Board, section officers or the committee chairman may appear before the legislature in its name, or request the legislative counsel to appear.

9. "During the session of the Legislature all sections and committees of the State Bar are expected to stand ready to: (a) Participate in explaining the bills recommended or opposed by the State Bar to the committees of the Legislature to whom they are referred; (b) Prepare explanatory material relative to any bill about which

lative session 1959–1960, the State Bar listed a $1,400 lobbying expense; this was a percentage of the salary of the executive director, based on an estimate of the time he spent in seeking to influence legislation, amounting to 5% of his salary for the two years. The registration statement signed by the then president of the State Bar added the explanatory note: "His activities as a lobbyist on behalf of the State Bar are incidental to his general work and occupy only a small portion of his time."

(2) The State Bar, through its Board of Governors or Executive Committee, has taken a formal

---

a question has arisen since its introduction; (c) Examine all bills advocated by others that would affect the courts, the judiciary, the legal profession, or the administration of justice in any particular, or that would make any changes in the substantive law, and keep the Board of Governors and the Executive Committee fully informed so that ill-advised bills can be opposed and meritorious bills can be supported. Committees of the Legislature should be encouraged to request the State Bar to study and to report its recommendations concerning all bills of this category."

10. The State Bar staff is directed to cooperate with all sections, committees, individual members, and local bar associations desiring to have bills drafted for introduction into the legislature.

11. To facilitate widespread study of legislative proposals, the State Bar shall issue a weekly legislative bulletin to officers, members of the Board of Governors and the Executive Committee, section and committee chairmen, presidents and secretaries of all local bar associations, judges, and other persons as directed by the Executive Committee.

12. Local bar associations are encouraged to take such action on legislation as they deem appropriate and forward their recommendations to the State Bar for consideration. Board of Governors Minutes, June 12, 1957.

By resolution in 1959 it was further provided that a committee or section may present its views on legislation without approval of the Board of Governors. But in so doing it must state that the position is that of the group or its officers, not that of the State Bar. Board of Governors Minutes, Feb. 18, 1959.

position with respect to a number of questions of legislative policy. These have included such subjects as an increase in the salaries of State Supreme Court justices; making attorneys notaries public; amending the Federal Career Compensation Act to apply to attorneys employed with the Armed Forces the same provisions for special pay and promotion available to members of other professions; improving pay scales of attorneys in state service; court reorganization; extending personal jurisdiction over nonresidents; allowing the recording of unwitnessed conveyances; use of deceased partners' names in firm names; revision of the law governing federal tax liens; law clerks for State Supreme Court justices; curtesy and dower; securities transfers by fiduciaries; jurisdiction of county courts over the administration of *inter vivos* trusts; special appropriations for research for the State Legislative Council.

(3) The standing committees, particularly the Committees on Legislation and Administration of Justice, and the sections have devoted considerable time to the study of legislation, the formulation of recommendations, and the support of various proposals. For example, the president reported in 1960 that the Committee on Legislation "has been extremely busy, and through its efforts in cooperation with other interested agencies has been instrumental in securing the passage of the Court Reorganization bill, the bill of the Judicial Council expanding personal jurisdiction, and at this recently resumed session a bill providing clerks for our Supreme Court, and other bills of importance to the administration of justice." Wis. Bar Bull., Aug. 1960, p. 41. See also *id.*, June 1959, pp. 64–65. A new subcommittee, on federal legislation, was set up by this committee following a study which found need for such a group

"to deal with federal legislation affecting the practice of law, or lawyers as a class, or the jurisdiction, procedure and practice of the Federal courts and other Federal tribunals, or creation of new Federal courts or judgeships affecting this state, and comparable subjects . . . ." Board of Governors Minutes, Dec. 11, 1959. Furthermore, legislative recommendations and activities have not been confined to those standing committees with the express function in the by-laws of considering legislative proposals. See, *e. g.,* Report of the Committee on Legal Aid, Wis. Bar Bull., June 1960, p. 61; Report of the Committee on Legal Aid, *id.,* June 1959, pp. 61–62. Many of the positions on legislation taken on behalf of the State Bar by the Board of Governors or the Executive Committee have also followed studies and recommendations by the sections. See, *e. g.,* Report of the Real Property, Probate and Trust Law Section, Wis. Bar Bull., June 1960, p. 51; Report of the Corporation and Business Law Section, *id.,* p. 56.

(4) A number of special committees have been constituted, either *ad hoc* to consider particular legislative proposals, or to perform continuing functions which may involve the consideration of legislation. Thus special committees have considered such subjects as extension of personal jurisdiction over nonresidents, law clerks for State Supreme Court justices, and revision of the federal tax lien laws. The Special Committee on World Peace through Law, which has encouraged the formation of similar committees on the local level, has sponsored debates on subjects such as the repeal of the Connally reservation, believing that "the general knowledge of laymen as well as of lawyers concerning the possibility of world peace through law is limited and requires a

constant program of education and discussion." Wis. Bar Bull., June 1960, p. 54.

(5) The Wisconsin Bar Bulletin, sent to each member, prints articles suggesting changes in state and federal law. And other publications of the State Bar deal with the progress of legislation.

But it seems plain that legislative activity is not the major activity of the State Bar. The activities without apparent political coloration are many. The Supreme Court provided in an appendix to the opinion below, "an analysis of [State Bar] . . . activities and the public purpose served thereby." 10 Wis. 2d, at p. 246, 102 N. W. 2d, at p. 412. The court found that "The most extensive activities of the State Bar are those directed toward postgraduate education of lawyers," and that "Postgraduate education of lawyers is in the public interest because it promotes the competency of lawyers to handle the legal matters entrusted to them by those of the general public who employ them." 10 Wis. 2d, at p. 246, 102 N. W. 2d, at pp. 412–413.[10] It found that the State Bar's partic-

---

[10] The statewide and regional meetings, the court found, are largely devoted "to the delivery of papers on technical legal subjects of an instructive nature." 10 Wis. 2d, at p. 246, 102 N. W. 2d, at pp. 412–413. The sections are particularly active in this regard. As a former president of the State Bar described their role: "The sections provide a special place where members with interest in particular fields of law may serve on committees and receive assistance and training in such fields. Moreover, the sections provide their own programs at each Annual and Midwinter meeting largely of a very practical and educational nature." Wis. Bar Bull., Aug. 1958, p. 71. See, e. g., Report of Corporation and Business Law Section, id., June 1960, p. 56; Report of Labor Law Section, id., p. 60. For example, the Taxation Section has sponsored an annual tax institute for practicing lawyers. See Report of Taxation Section, Wis. Bar Bull., June 1959, pp. 53–54. Many of the papers delivered at such sessions are later given wider circulation to the Bar by publication in the Bar Bulletin. In addition, the State Bar has undertaken the sponsorship of numerous special

ipation in the handling of grievances improved the efficiency and effectiveness of this work.[11]   It found that the public interest was furthered by the Committee on Unauthorized Practice of Law which was carrying on "a constant program since numerous trades and occupations keep expanding their services and frequently start offering services which constitute the practice of the law."   10 Wis. 2d, at p. 248, 102 N. W. 2d, at p. 413.[12]   The court

seminars and symposia, see, *e. g.,* Wis. Bar Bull., Aug. 1960, p. 41.  And it has made funds available to the University of Wisconsin Law School to compensate students for assisting in the preparation of materials for post-graduate programs.  See Board of Governors Minutes, Apr. 25, 1958; Wis. Bar Bull., Aug. 1958, pp. 69–70.

[11] Prior to integration the Board of State Bar Commissioners conducted and paid for the investigation of grievances.  Since then the grievance committees have performed most of that work, with a resulting diminution in the financial needs of the bar commissioners. A former president of the State Bar commented on these committees' performance of their functions: "The result is that a majority of complaints are adjusted or explained to the satisfaction of the complainant, and the State Bar Commissioners are saved considerable time and effort . . . ."   Wis. Bar Bull., Aug. 1958, p. 68.  See also *id.,* Aug. 1960, p. 41.

[12] Revenues from integration enabled the State Bar to employ a lawyer whose principal task is the investigation of complaints of unauthorized practice and the effort to achieve its discontinuance. A number of legal actions to prevent unauthorized practice have been instituted.  See, *e. g.,* Wis. Bar Bull., Aug. 1960, p. 45; *id.,* June 1960, pp. 49–50; *id.,* June 1958, pp. 48–49.  The Committee on Unauthorized Practice has also worked with the Committee on Interprofessional and Business Relations in conferring with other professional groups to establish demarcation lines between their activities and those of the bar.  Thus an agreement was negotiated with the Association of Certified Public Accountants and a joint committee provided to police it.  See Board of Governors Minutes, Dec. 9, 1960. The Committee on Interprofessional and Business Relations has also participated in projects for the formulation of agreements with the Association of Real Estate Brokers and the Association of Collection Agencies, and its program includes conferences with other profes-

also concluded that the Legal Aid Committee had "done effective and noteworthy work to encourage the local bar associations of the state to set up legal-aid systems in their local communities. . . . Such committee has also outlined recommended procedures for establishing and carrying through such systems of providing legal aid." 10 Wis. 2d, at p. 249, 102 N. W. 2d, at p. 414.[13] In the field of public relations the court found that the "chief activity" of the State Bar was the "preparation, publication, and distribution to the general public of pamphlets dealing with various transactions and happenings with which laymen are frequently confronted, which embody legal problems." 10 Wis. 2d, at p. 247, 102 N. W. 2d, at p. 413.[14]

sional groups. See Executive Committee Minutes, July 22, 1960. Legal ethics is another concern of the State Bar. Its Committee on Professional Ethics has given opinions on a number of questions of ethical practice. See, e. g., Wis. Bar Bull., June 1960, pp. 46–49.

[13] The number of lawyers in Wisconsin participating in legal aid has steadily increased. The committee reported in 1960 that it would "continue to vigorously carry on its program of rendering prompt and efficient legal aid services to all those who require the same; to continue to work diligently to the realization of the goal that every county bar association within our State have an effective legal aid bureau or legal aid society as soon as possible; to continue our policy of bringing into our open forum meetings on legal aid, the most outstanding authorities on the subject, to the end that we here in the State of Wisconsin will at all times have the fullest, up-to-date information on every phase of legal aid . . . ." Wis. Bar Bull., June 1960, p. 64. See also id., June 1959, p. 63.

[14] The State Bar has also prepared articles on legal subjects for distribution to newspapers throughout the State. It has been concerned with the promotion of the annual Law Day. See, e. g., Wis. Bar Bull., Aug. 1958, p. 67. The Bar Bulletin, in addition to publishing articles on legal subjects, has issued special supplements explaining and annotating new laws and has printed checklists for attorneys suggesting how to proceed with various legal problems. Its avowed aim is to make the Bulletin "a very practical means for all practicing lawyers to keep posted on the ever-changing requirements in the practice. . . . We believe that one of the great justifications for integration is found

Moreover, a number of studies have been made of programs, not involving political action, to further the economic well-being of the profession.[15]

This examination of the purposes and functions of the State Bar shows its multifaceted character, in fact as well as in conception. In our view the case presents a claim of impingement upon freedom of association no different from that which we decided in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225. We there held that § 2, Eleventh of the Railway Labor Act, 45 U. S. C. § 152, Eleventh, did not on its face abridge protected rights of association in authorizing union-shop agreements between interstate railroads and unions of their employees conditioning the employees' continued employment on payment of union dues, initiation fees and assessments.

---

in the means of publication and communication from the Bar to the member through these vehicles." Wis. Bar Bull., June 1960, p. 67.

[15] The stated functions of the Special Committee on Economics of the Bar are: "[t]he committee will engage itself in the general study of the economics of the Bar to determine a fair fee schedule from time to time; seek its uniform adoption and recognition throughout the state; study the encroachment of lay agencies on the fields of law; make suggestions for proper office management, and make such recommendations from time to time as it considers proper in the general field." Wis. Bar Bull., June 1959, p. 58. One of the principal products of such activity has been a recommended schedule of minimum fees for Wisconsin lawyers; this schedule was published and distributed at a cost of over $10,000 to the State Bar. See Wis. Bar Bull., Aug. 1960, p. 40; also *id.,* pp. 10–11. Another project authorized by the Board of Governors is a comprehensive statistical study of the economic status of Wisconsin lawyers. See Board of Governors Minutes, Sept. 23, 1960, Dec. 9, 1960. Other special committees have considered such matters as group insurance for State Bar members and creation of a client security plan to insure against attorneys' defalcations. See, *e. g.,* Wis. Bar Bull., Aug. 1960, p. 41; Board of Governors Minutes, Feb. 18, 1959; Executive Committee Minutes, Sept. 23, 1960.

.

There too the record indicated that the organizations engaged in some activities similar to the legislative activities of which the appellant complains. See *International Association of Machinists* v. *Street, ante,* p. 748, note 5. In rejecting Hanson's claim of abridgment of his rights of freedom of association, we said, "On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar." 351 U. S., at 238. Both in purport and in practice the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State, without any reference to the political process. It cannot be denied that this is a legitimate end of state policy.[16] We think that the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity. Given the character of the integrated bar shown on this record, in the light of the limitation of the membership requirement to the compulsory payment of reasonable annual dues, we are unable to find any impingement upon protected rights of association.

---

[16] On the subject of integration of the bar in the United States, see generally Glaser, The Organization of the Integrated Bar, The Debate Over the Integrated Bar, and Bibliography on the Integrated Bar (Columbia University Bureau of Applied Social Research). Comprehensive discussions of integration of the Bar in the various States are contained in briefs *amici curiae* filed with the Court in this case.

However, appellant would have us go farther and decide whether his constitutional rights of free speech are infringed if his dues money is used to support the political activities of the State Bar. The State Supreme Court treated the case as raising the question whether First Amendment rights were violated "because part of his dues money is used to support causes to which he is opposed." 10 Wis. 2d, at p. 238, 102 N. W. 2d, at p. 409. The Court in rejecting appellant's argument reasoned that "[t]he right to practice law is not a right but is a privilege subject to regulation. . . . The only limitation upon the state's power to regulate the privilege of the practice of law is that the regulations adopted do not impose an unconstitutional burden or deny due process." 10 Wis. 2d, at pp. 237–238, 102 N. W. 2d, at p. 408. The Court found no such burden because ". . . the public welfare will be promoted by securing and publicizing the composite judgment of the members of the bar of the state on measures directly affecting the administration of justice and the practice of law. The general public and the legislature are entitled to know how the profession as a whole stands on such type of proposed legislation. . . . The only challenged interference with his liberty is the exaction of annual dues to the State Bar, in the nature of the imposition of an annual license fee, not unreasonable or unduly burdensome in amount, part of which is used to advocate causes to which he is opposed. However, this court, in which is vested the power of the state to regulate the practice of law, has determined that it promotes the public interest to have public expression of the views of a majority of the lawyers of the state, with respect to legislation affecting the administration of justice and the practice of law, the same to be voiced through their own democratically chosen representatives comprising the board of governors of the State Bar. The public interest so promoted far outweighs the slight inconvenience to the plaintiff result-

ing from his required payment of the annual dues." 10 Wis. 2d, at pp. 239, 242, 102 N. W. 2d, at pp. 409, 411.[17]

We are persuaded that on this record we have no sound basis for deciding appellant's constitutional claim insofar as it rests on the assertion that his rights of free speech are violated by the use of his money for causes which he opposes. Even if the demurrer is taken as admitting all the factual allegations of the complaint, even if these allegations are construed most expansively, and even if, like the Wisconsin Supreme Court, we take judicial notice of the political activities of the State Bar, still we think that the issue of impingement upon rights of free speech through the use of exacted dues is no more concretely presented for adjudication than it was in *Hanson*. Compare *International Association of Machinists* v. *Street, ante,* p. 740, at pp. 747–749. Nowhere are we clearly

---

[17] The Wisconsin Supreme Court originally declined to order integration partly because of misgivings whether possible political activities of the integrated Bar would be consistent with the public interest sought to be served. See *In re Integration of the Bar,* 249 Wis. 523, 25 N. W. 2d 500. It indicated that integration would "require it to censor the budgets and activities of the bar after integration" and said: "It requires a very short look at some of the possible activities of the bar to make it clear that this court would have to insist upon scrutinizing every activity for which it is proposed to expend funds derived from dues, and that a series of situations would arise that would be embarrassing to the relations of bench and bar." 249 Wis., at pp. 528, 529–530, 25 N. W. 2d, at pp. 502, 503. These reservations were expressly disclaimed when the court continued integration in 1958, 5 Wis. 2d 618, 626–627, 93 N. W. 2d 601, 605. The court said: "The integrated State Bar of Wisconsin is independent and free to conduct its activities within the framework of such rules and by-laws." 5 Wis. 2d, at p. 626, 93 N. W. 2d, at p. 605. The court reiterated this position in the present case: "In so far as it confines such activities to those authorized by the rules and by-laws, this court will not interfere or in any manner seek to control or censor the action taken, or to substitute its judgment for that of the membership of the State Bar." 10 Wis. 2d, at p. 240, 102 N. W. 2d, at p. 410.

apprised as to the views of the appellant on any particular legislative issues on which the State Bar has taken a position, or as to the way in which and the degree to which funds compulsorily exacted from its members are used to support the organization's political activities.   There is an allegation in the complaint that the State Bar had "used its employees, property and funds in active, unsolicited opposition to the adoption of legislation by the Legislature of the State of Wisconsin, which was favored by the plaintiff, all contrary to the plaintiff's convictions and beliefs," but there is no indication of the nature of this legislation, nor of appellant's views on particular proposals, nor of whether any of his dues were used to support the State Bar's positions.   There is an allegation that the State Bar's revenues amount to about $90,000 a year, of which $80,000 is derived from dues, but there is no indication in the record as to how political expenditures are financed and how much has been expended for political causes to which appellant objects.   The facts of which the Supreme Court took judicial notice do not enlighten us on these gaps in the record.   The minutes of the Board of Governors and Executive Committee of the State Bar show that the organization has taken one position or another on a wide variety of issues, but those minutes give no indication of appellant's views as to any of such issues or of what portions of the expenditure of funds to propagate the State Bar's views may be properly apportioned to his dues payments.   Nor do the other publications of the State Bar.   The Supreme Court assumed, as apparently the trial court did in passing on the demurrer, that the appellant was personally opposed to some of the legislation supported by the State Bar.   But its opinion still gave no description of any specific measures he opposed, or the extent to which the State Bar actually utilized dues funds for specific purposes to which he had objected.   Appellant's phrasing of the question presented on appeal in this

Court is not responsive to any of these inquiries as to facts which may be relevant to the determination of constitutional questions surrounding the political expenditures. It merely asks whether a requirement of financial support of an association which, "among other things, uses its property, funds and employees for the purpose of influencing a broad range of legislation and public opinion" can be constitutionally imposed on him. This statement of the question, just as does his complaint, appears more a claim of the right to be free from compelled financial support of the organization because of its political activities, than a challenge by appellant to the use of his dues money for particular political causes of which he disapproves. Moreover, although the court below purported to decide as against all Fourteenth Amendment claims that the appellant could be compelled to pay his annual dues, even though "part . . . is used to support causes to which he is opposed," on oral argument here appellant disclaimed any necessity to show that he had opposed the position of the State Bar on any particular issue and asserted that it was sufficient that he opposed the use of his money for any political purposes at all. In view of the state of the record and this disclaimer, we think that we would not be justified in passing on the constitutional question considered below. "[T]he questions involving the power of . . . [the State] come here not so shaped by the record and by the proceedings below as to bring those powers before this Court as leanly and as sharply as judicial judgment upon an exercise of . . . [state] power requires." *United States* v. *C. I. O.*, 335 U. S. 106, 126 (concurring opinion). Cf. *United States* v. *U. A. W.-C. I. O.*, 352 U. S. 567, 589–592.

We, therefore, intimate no view as to the correctness of the conclusion of the Wisconsin Supreme Court that the appellant may constitutionally be compelled to contribute his financial support to political activities which

he opposes. That issue is reserved, just as it was in *Hanson*, see *International Association of Machinists* v. *Street, ante,* p. 740, at 746–749. Upon this understanding we four vote to affirm. Since three of our colleagues are of the view that the claim which we do not decide is properly here and has no merit, and on that ground vote to affirm, the judgment of the Wisconsin Supreme Court is

*Affirmed.*

Mr. Justice Harlan, with whom Mr. Justice Frankfurter joins, concurring in the judgment.

I think it most unfortunate that the right of the Wisconsin Integrated Bar to use, in whole or in part, the dues of dissident members to carry on legislative and other programs of law reform—doubtless among the most useful and significant branches of its authorized activities—should be left in such disquieting Constitutional uncertainty. The effect of that uncertainty is compounded by the circumstance that it will doubtless also reach into the Integrated Bars of twenty-five other States.[1]

I must say, with all respect, that the reasons stated in the plurality opinion for avoiding decision of this Constitutional issue can hardly be regarded as anything but trivial. For, given the unquestioned fact that the Wisconsin Bar uses or threatens to use, over appellant's protest, some part of its receipts to further or oppose legislation on matters of law reform and the administration of

---

[1] Alabama, Alaska, Arizona, California, Florida, Idaho, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, Wyoming. See note 14, dissenting opinion of Mr. Justice Frankfurter in *International Machinists* v. *Street, ante,* p. 808. Arkansas has a Bar which is integrated only with respect to disciplinary matters. 207 Ark. xxxiv–xxxvii.

justice, I am at a loss to understand how it can be thought that this record affords "no sound basis" for adjudicating the issue simply because we are not "clearly apprised as to the views of the appellant on any particular legislative issues on which the State Bar has taken a position, or as to the way in which and the degree to which funds compulsorily exacted from its members are used to support the organization's political activities" (*ante,* pp. 845-846). I agree with my Brother BLACK that the Constitutional issue is inescapably before us.

Unless one is ready to fall prey to what are at best but alluring abstractions on rights of free speech and association, I think he will be hard put to it to find any solid basis for the Constitutional qualms which, though unexpressed, so obviously underlie the plurality opinion, or for the views of my two dissenting Brothers, one of whom finds unconstitutional the entire Integrated Bar concept (*post,* pp. 877–885), and the other of whom holds the operations of such a Bar unconstitutional to the extent that they involve taking "the money of protesting lawyers" and using "it to support causes they are against" (*post,* p. 871).

For me, there is a short and simple answer to all of this. The *Hanson* case, 351 U. S. 225, decided by a unanimous Court, surely lays at rest all doubt that a State may Constitutionally condition the right to practice law upon membership in an integrated bar association, a condition fully as justified by state needs as the union shop is by federal needs. Indeed the conclusion reached in *Hanson* with respect to compulsory union membership seems to me *a fortiori* true here, in light of the supervisory powers which the State, through its courts, has traditionally exercised over admission to the practice of law, see *Konigsberg* v. *State Bar of California,* 366 U. S. 36; *In re Anastaplo,* 366 U. S. 82, and over the conduct of lawyers after admission, see *Cohen* v. *Hurley,* 366 U. S. 117. The Integrated Bar was in fact treated as such an *a fortiori* case in the

*Hanson* opinion itself. *Supra,* at 238. So much, indeed, is recognized by the plurality opinion which rejects the contention that Wisconsin could not Constitutionally require appellant, a lawyer, to become and remain a dues-paying member of the State Bar.

That being so, I do not understand why it should become unconstitutional for the State Bar to use appellant's dues to fulfill some of the very purposes for which it was established. I am wholly unable to follow the force of reasoning which, on the one hand, denies that compulsory dues-paying membership in an Integrated Bar infringes "freedom of association," and, on the other, in effect affirms that such membership, to the extent it entails the use of a dissident member's dues for legitimate Bar purposes, infringes "freedom of speech." This is a refinement between two aspects of what, in circumstances like these, is essentially but a single facet of the "liberty" assured by the Fourteenth Amendment, see *N. A. A. C. P. v. Alabama,* 357 U. S. 449, 460, that is too subtle for me to grasp.

Nevertheless, since a majority of the Court here, as in the *Street* case, *ante,* p. 740, has deemed the "free speech" issue to be distinct from that of "free association," I shall also treat the case on that basis. From a Constitutional standpoint, I think that there can be no doubt about Wisconsin's right to use appellant's dues in furtherance of any of the purposes now drawn in question.[2] Orderly analysis

---

[2] Among other things, the Integrated Bar of the State of Wisconsin is authorized by the State Supreme Court, acting under its inherent rule-making powers, to publish information relating to "the practice of law, the science of jurisprudence and law reform, and the relations of the bar to the public." Rule 1, 273 Wis. xi. Rule 4, § 4, provides for standing committees including, *inter alia,* Committees on Administration of Justice and on Legislation. 273 Wis. xvi. The function of the former, as set out in Art. IV, § 4, of the by-laws, 273 Wis. xxxiii, is to "study the organization and operation of the Wisconsin judicial

requires that there be considered, *first,* the respects in which it may be thought that the use of a member's dues for causes he is against impinges on his right of free speech, and *second,* the nature of the state interest offered to justify such use of the dues exacted from him. I shall also add some further observations as to the over-all Constitutionality of the Integrated Bar concept.

## I.

To avoid the pitfall of disarming, and usually obscuring, generalization which too often characterizes discussions in this Constitutional field, I see no alternative (even at the risk of being thought to labor the obvious) but to deal in turn with each of the various specific impingements on "free speech" which have been suggested or intimated to flow from the State Bar's use of an objecting member's dues for the purposes involved in this case. As I understand things, it is said that the operation of the Integrated Bar tends (1) to reduce a dissident member's "economic capacity" to espouse causes in which he believes; (2) to further governmental "establishment" of political views; (3) to threaten development of a "guild

system and . . . recommend from time to time appropriate changes in practice and procedure for improving the efficiency thereof . . . ." The function of the Committee on Legislation is to study and, in certain circumstances, support or oppose "proposals submitted to the Wisconsin legislature or the congress of the United States for changes in the statutes relating to the courts or the practice of law . . . ." Art. IV, § 9, 273 Wis. xxxiv. The enabling court rules indicate authorization for further study and comment on proposed legislation, for the board of governors is directed to establish sections on corporation and business law; family law; house counsel; insurance, negligence and workmen's compensation law; labor relations law; military law; real property, probate, and trust law; and taxation. 273 Wis. xvii. The plurality opinion of this Court sets out the nature and scope of the activities bearing on prospective legislation actually engaged in by this Integrated Bar. *Ante,* pp. 835–839.

system" of closed, self-regulating professions and businesses; (4) to "drown out" the voice of dissent by requiring all members of the Bar to lend financial support to the views of the majority; and (5) to interfere with freedom of belief by causing "compelled affirmation" of majority-held views. With deference, I am bound to say that, in my view, all of these arguments border on the chimerical.

## 1. REDUCTION IN "ECONOMIC CAPACITY" TO ESPOUSE VIEWS.

This argument which, if indeed suggested at all, is intimated only obliquely, is that the mere exaction of dues money works a Constitutionally cognizable inhibition of speech by reducing the resources otherwise available to a dissident member for the espousal of causes in which he believes. The untenability of such a proposition becomes immediately apparent when it is recognized that this rationale would make every governmental exaction the material of a "free speech" issue. Even the federal income tax would be suspect. And certainly this source of inhibition is as great if the Integrated Bar wastes its dues on dinners as if it spends them on recommendations to the legislature. Yet I suppose that no one would be willing to contend that every waste of money exacted by some form of compulsion is an abridgment of free speech.

## 2. "ESTABLISHMENT" OF POLITICAL VIEWS.

The suggestion that a state-created Integrated Bar amounts to a governmental "establishment" of political belief is hardly worthy of more serious consideration. Even those who would treat the Fourteenth Amendment as embracing the identical protections afforded by the First would have to recognize the clear distinction in the wording of the First Amendment between the protections of speech and religion, only the latter providing a protection against "establishment." And as to the Four-

teenth, viewed independently of the First, one can surely agree that a State could not "create a fund to be used in helping certain political parties or groups favored" by it "to elect their candidates or promote their controversial causes" (*ante*, p. 788), any more than could Congress do so, without agreeing that this is in any way analogous to what Wisconsin has done in creating its Integrated Bar, or to what Congress has provided in the Railway Labor Act, considered in the *Street* case, *ante*, p. 740.

In establishing the Integrated Bar Wisconsin has, I assume all would agree, shown no interest at all in favoring particular candidates for judicial or legal office or particular types of legislation. Even if Wisconsin had such an interest, the Integrated Bar does not provide a fixed, predictable conduit for governmental encouragement of particular views, for the Bar makes its own decisions on legislative recommendations and appears to take no action at all with regard to candidates. By the same token the weight lent to one side of a controversial issue by the prestige of government is wholly lacking here.

In short, it seems to me fanciful in the extreme to find in the limited functions of the Wisconsin State Bar those risks of governmental self-perpetuation that might justify the recognition of a Constitutional protection against the "establishment" of political beliefs. A contrary conclusion would, it seems to me, as well embrace within its rationale the operations of the Judicial Conference of the United States, and the legislative recommendations of independent agencies such as the Interstate Commerce Commission and the Bureau of the Budget.

3. DEVELOPMENT OF A "GUILD SYSTEM."

It is said that the Integrated Bar concept tends towards the development of some sort of a "guild system." But there are no requirements of action or inaction connected

with the Wisconsin Integrated Bar, as contrasted with any unintegrated bar, except for the requirement of payment of $15 annual dues. I would agree that the requirement of payment of dues could not be made the basis of limiting the profession of law to the comparatively wealthy. Cf. *Griffin* v. *Illinois,* 351 U. S. 12. Nor, doubtless, could admission to the profession be restricted to relatives of those already admitted. But there is no such "guild" threat presented in this situation.

True, the Wisconsin Bar makes recommendations to the State Supreme Court for regulatory canons of legal ethics, and it may be supposed that the Bar is not forbidden to address the State Legislature for measures regulating in some respects the conduct of lawyers. But neither activity is the kind of direct self-regulation that was stricken down in *Schechter Corp.* v. *United States,* 295 U. S. 495. The Wisconsin Supreme Court has retained *all* of the traditional powers of a court to supervise the activities of practicing lawyers. It has delegated *none* of these to the Integrated Bar. As put by the State Supreme Court:

> "The integrated bar has no power to discipline or to disbar any member. That power has been reserved to and not delegated by this court. The procedure under sec. 256.28, Stats., for filing complaints for discipline or disbarment in this court is unaffected by these rules. Rule 11 and Rule 7 provide an orderly and easy method by which proposals to amend or abrogate the rules of the State Bar may be brought before this court for hearing on petition. Rule 9 provides the rules of professional conduct set forth from time to time in the Canons of the Professional Ethics of the American Bar Association, as supplemented or modified by pronouncement of this court, shall be the standard governing the practice of law in this state. Prior to the adoption of the rules

this court has not expressly adopted such Canons of Professional Ethics *in toto*.

"The by-laws of the State Bar provide for the internal workings of the organization and by Rule 11, sec. 2, may be amended or abrogated by resolution adopted by a vote of two-thirds of the members of the board of governors or by the members of the association themselves through the referendum procedure. As a further protection to the minority a petition for review of any change in the by-laws made by the board of governors will be entertained by the court if signed by 25 or more active members.

"Independently of the provisions in the rules for invoking our supervisory jurisdiction, this court has inherent power to take remedial action, on a sufficient showing that the activities or policies of the State Bar are not in harmony with the objectives for which integration was ordered or are otherwise contrary to the public interest." *In re Integration of Bar,* 5 Wis. 2d 618, 624–625, 93 N. W. 2d 601, 604.

Moreover, it is by no means clear to me in what part of the Federal Constitution we are to find the prohibition of *state-authorized* self-regulation of and by an economic group that the *Schechter* case found in Article I as respects the Federal Government. Is state-authorized self-regulation of lawyers to be the occasion for judicial enforcement of Art. IV, § 4, which provides that "The United States shall guarantee to every state in this union a Republican form of government . . ."? Cf. *Luther* v. *Borden,* 7 How. 1; *Pacific States Tel. & Tel. Co.* v. *Oregon,* 223 U. S. 118.

### 4. "Drowning Out" the Voice of Dissent.

This objection can be stated in either of two ways. First: The requirement of dues payments to be spent to further views to which the payor is opposed tends to

increase the volume of the arguments he opposes and thereby to drown out his own voice in opposition, in violation of his Constitutional right to be heard. Second: The United States Constitution creates a scheme of federal and state governments each of which is to be elected on a one-man-one-vote basis and on a one-man-one-political-voice basis. Of course several persons may voluntarily cumulate their political voices, but no governmental force can require a single individual to contribute money to support views to be adopted by a democratically organized group even if the individual is also free to say what he pleases separately.

It seems to me these arguments have little force. In the first place, their supposition is that the voice of a dissenter is less effective if he speaks it first in an attempt to influence the action of a democratically organized group and then, if necessary, in dissent to the recommendations of that group. This is not at all convincing. The dissenter is not being made to contribute funds to the furtherance of views he opposes but is rather being made to contribute funds to a group expenditure about which he will have something to say. To the extent that his voice of dissent can convince his lawyer associates, it will later be heard by the State Legislature with a magnified voice. In short, I think it begs the question to approach the Constitutional issue with the assumption that the majority of the Bar has a permanently formulated position which the dissenting dues payor is being required to support, thus increasing the difficulty of effective opposition to it.

Moreover, I do not think it can be said with any assurance that being required to contribute to the dispersion of views one opposes has a substantial limiting effect on one's right to speak and be heard. Certainly these rights would be limited if state action substantially reduced one's ability to reach his audience. But are these rights substantially affected by increasing the opposition's ability

to reach the same audience? I can conceive of instances involving limited facilities, such as television time, which may go to the highest bidder, wherein increasing the resources of the opposition may tend to reduce a dissident's access to his audience. But before the Constitution comes into play, there should surely be some showing of a relationship between required financial support of the opposition and reduced ability to communicate, a showing I think hardly possible in the case of the legislative recommendations of the Wisconsin Bar. And, aside from the considerations of freedom from compelled affirmations of belief to be discussed later, I can find little basis for a right not to have one's opposition heard.

Beyond all this, the argument under discussion is contradicted in the everyday operation of our society. Of course it is disagreeable to see a group, to which one has been required to contribute, decide to spend its money for purposes the contributor opposes. But the Constitution does not protect against the mere play of personal emotions. We recognized in *Hanson* that an employee can be required to contribute to the propagation of personally repugnant views on working conditions or retirement benefits that are expressed on union picket signs or in union handbills. A federal taxpayer obtains no refund if he is offended by what is put out by the United States Information Agency. Such examples could be multiplied.

For me, this "drowning out" argument falls apart upon analysis.

### 5. "Compelled Affirmation" of Belief.

It is argued that the requirement of Bar dues payments which may be spent for legislative recommendations which the payor opposes amounts to a compelled affirmation of belief of the sort this Court struck down in *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624. While I agree that the rationale of *Barnette* is relevant,

I do not think that it is in any sense controlling in the present case.

Mr. Justice Jackson, writing for the Court in *Barnette*, did not view the issue as turning merely "on one's possession of particular religious views or the sincerity with which they are held." 319 U. S., at 634. The holding of *Barnette* was that, no matter how strong or weak such beliefs might be, the Legislature of West Virginia was not free to require as concrete and intimate an expression of belief in any cause as that involved in a compulsory pledge of allegiance. It is in this light that one must assess the contention that, "Compelling a man by law to pay his money to elect candidates or advocate laws or doctrines he is against differs only in degree, if at all, from compelling him by law to speak for a candidate, a party, or a cause he is against" (*ante*, p. 788). One could as well say that the same mere difference in degree distinguishes the *Barnette* flag salute situation from a taxpayer's objections to the views a government agency presents, at public expense, to Congress. What seems to me obvious is the large difference in degree between, on the one hand, being compelled to raise one's hand and recite a belief as one's own, and, on the other, being compelled to contribute dues to a bar association fund which is to be used in part to promote the expression of views in the name of the organization (not in the name of the dues payor), which views when adopted may turn out to be contrary to the views of the dues payor. I think this is a situation where the difference in degree is so great as to amount to a difference in substance.

In *Barnette* there was a governmental purpose of requiring expression of a view in order to encourage adoption of that view, much the same as when a school teacher requires a student to write a message of self-correction on the blackboard one hundred times. In the present case there is no indication of a governmental purpose to fur-

ther the expression of any particular view. More than that, the State Bar's purpose of furthering expression of views is unconnected with any desire to induce belief or conviction by the device of forcing a person to identify himself with the expression of such views. True, purpose may not be controlling when the identification is intimate between the person who wishes to remain silent and the beliefs foisted upon him. But no such situation exists here where the connection between the payment of an individual's dues and the views to which he objects is factually so remote. Surely the Wisconsin Supreme Court is right when it says that petitioner can be expected to realize that "everyone understands or should understand" that the views expressed are those "of the State Bar as an entity separate and distinct from each individual." 5 Wis. 2d, at 623, 93 N. W. 2d, at 603.

Indeed, I think the extreme difficulty the Court encounters in the *Street* case (*ante,* p. 740) in finding a mechanism for reimbursing dissident union members for their share of "political" expenditures is wholly occasioned by, and is indicative of, the many steps of changed possession, ownership, and control of dues receipts and the multiple stages of decision making which separate the dues payor from the political expenditure of some part of his dues. I think these many steps and stages reflect as well upon whether there is an identification of dues payor and expenditure so intimate as to amount to a "compelled affirmation." Surely if this Court in *Street* can only with great difficulty—if at all—identify the contributions of particular union members with the union's political expenditures, we should pause before assuming that particular Bar members can sensibly hear their own voices when the State Bar speaks as an organization.

Mr. Justice Cardozo, writing for himself, Mr. Justice Brandeis, and Mr. Justice Stone in *Hamilton* v. *Regents,* 293 U. S. 245, 265, thought that the remoteness of the

connection between a conscientious objection to war and the study of military science was in itself sufficient to make untenable a claim that requiring this study in state universities amounted to a state establishment of religion. These Justices thought the case even clearer when all that was involved was a contribution of money:

> "Manifestly a different doctrine would carry us to lengths that have never yet been dreamed of. The conscientious objector, if his liberties were to be thus extended, might refuse to contribute taxes in furtherance of a war . . . or in furtherance of any other end condemned by his conscience as irreligious or immoral. The right of private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government." *Hamilton* v. *Regents,* 293 U. S. 245, 268.

Nor do I now believe that a state taxpayer could object on Fourteenth Amendment grounds to the use of his money for school textbooks or instruction which he finds intellectually repulsive, nor for the mere purchase of a flag for the school. In the present case appellant is simply required to pay dues into the general funds of the State Bar. I do not think a subsequent decision by the representatives of the majority of the bar members to devote some part of the organization's funds to the furtherance of a legislative proposal so identifies the individual payor of dues with the belief expressed that we are in the *Barnette* realm of "asserted power to force an American citizen publicly to profess any statement of belief or to engage in any ceremony of assent to one. . . ." 319 U. S., at 634.

It seems to me evident that the actual core of appellant's complaint as to "compelled affirmation" is not the identification with causes to which he objects that might arise from some conceivable tracing of the use of his dues in their support, but is his forced association with the

Integrated Bar. · That, however, is a bridge which, beyond all doubt and any protestations now made to the contrary, we crossed in the *Hanson* case. I can see no way· to uncross it without overruling *Hanson*. Certainly it cannot be done by declaring as a rule of law that lawyers feel more strongly about the identification of their names with proposals for law reform than union members feel about the identification of their names with collective bargaining demands declared on the radio, in picket signs, and on handbills.

II.

While I think that what has been said might well dispose of this case without more, in that Wisconsin lawyers retain "full freedom to think their own thoughts, speak their own minds, support their own causes and wholeheartedly fight whatever they are against" (*post,* p. 874), I shall pass on to consider the state interest involved in the establishment of the Integrated Bar, the other ingredient of adjudication which arises whenever incidental impingement upon such freedoms may fairly be said to draw in question governmental action. See, *e. g., Barenblatt* v. *United States,* 360 U. S. 109; *Konigsberg* v. *State Bar of California, supra.*

In this instance it can hardly be doubted that it was Constitutionally permissible for Wisconsin to regard the functions of an Integrated Bar as sufficiently important to justify whatever incursions on these individual freedoms may be thought to arise from the operations of the organization. The Wisconsin Supreme Court has described the fields of the State Bar's legislative activities and has asserted its readiness to restrict legislative recommendations to those fields:

"This court takes judicial notice of the activities of the State Bar in the legislative field since its creation by this court in 1956. In every instance the

legislative measures advocated or opposed have dealt with the administration of justice, court reform, and legal practice. Neither the above-quoted by-laws nor the stated purposes set forth in section 2 of Rule 1 for which the bar was integrated would permit the State Bar to be engaged in legislative activities unrelated to these three subjects. . . . However, as we pointed out in our opinion in the 1958 *In re Integration of the Bar Case,* this court will exercise its inherent power to take remedial action should the State Bar engage in an activity not authorized by the rules and by-laws and not in keeping with the stated objectives for which it was created. If the lawyers of the state wish by group action to engage in legislative activities not so authorized they will have to do so within the framework of some voluntary association, and not the State Bar." 10 Wis. 2d 230, 239–240, 102 N. W. 2d 404, 409–410.

Further, the same court has declared its belief that the lawyers of the State possess an expertise useful to the public interest within these fields:

"We are of the opinion that the public welfare will be promoted by securing and publicizing the composite judgment of the members of the bar of the state on measures directly affecting the administration of justice and the practice of law. The general public and the legislature are entitled to know how the profession as a whole stands on such type of proposed legislation. This is a function an integrated bar, which is as democratically governed and administered as the State Bar, can perform much more effectively than can a voluntary bar association." *Ibid.*

I do not think that the State Court's view in this respect can be considered in any way unreasonable.

"[T]he composite judgment of the members of the bar of the state on measures directly affecting the administration of justice and the practice of law" may well be as helpful and informative to a state legislature as the work of individual legal scholars and of such organizations as the American Law Institute, for example, is to state and federal courts. State and federal courts are, of course, indifferent to the personal beliefs and predilections of any of such groups. The function such groups serve is a rationalizing one and their power flows from and is limited to their ability to convince by arguments from generally agreed upon premises. They are exercising the techniques and knowledge which lawyers are trained to possess in the task of solving problems with which the legal profession is most familiar. The numberless judicial citations to their work is proof enough of their usefulness in the judicial decision-making process.[3]

Legislatures too have found that they can benefit from a legal "expert's effort to improve the law in technical and non-controversial areas." *Dulles* v. *Johnson,* 273 F. 2d 362, 367. In the words of the Executive Secretary of the New York Law Revision Commission, there are areas in which "lawyers as lawyers have more to offer, to solve a given question, than other skilled persons or groups." 40 Cornell L. Q. 641, 644. See also Cardozo, A Ministry of Justice, 35 Harv. L. Rev. 113. The Acts recommended by the Commissioners on Uniform State Laws have been adopted on over 1,300 occasions by the legislatures of the fifty States, Puerto Rico, and the District of Columbia. Handbook of the National Conference of Commissioners on Uniform State Laws (1960), at p. 207. There is no way of counting the number of occasions on which state legislatures have utilized the assistance of

[3] The nine Restatements of the law alone have been cited well over 27,000 times. 36th Annual Meeting, The American Law Institute, at p. 63.

legal advisory groups. Some indication may be obtained by noting that thirty-one jurisdictions have permanent legislative service agencies which recommend "substantive" legislative programs and forty-two jurisdictions utilize such permanent agencies in recommending statutory revision.[4]

In this light I can only regard as entirely gratuitous a contention that there is anything less than a most substantial state interest in Wisconsin having the views of the members of its Bar "on measures directly affecting the administration of justice and the practice of law." Nor can I take seriously a suggestion that the lawyers of Wisconsin are merely being polled on matters of their own personal belief or predilection, any more than Congress had in mind such a poll when it made it the duty of federal circuit judges summoned to attend the Judicial Conference of the United States "to advise . . . as to any matters in respect of which the administration of justice in the courts of the United States may be improved." 42 Stat. 837, 838.

### III.

Beyond this conjunction of a highly significant state need and the chimerical nature of the claims of abridgment of individual freedom, there is still a further approach to the entire problem that combines both of these aspects and reinforces my belief in the Constitutionality of the Integrated Bar.

I had supposed it beyond doubt that a state legislature could set up a staff or commission to recommend changes in the more or less technical areas of the law into which no well-advised laymen would venture without the assistance of counsel. A state legislature could certainly appoint a commission to make recommendations to it on the desirability of passing or modifying any of the count-

---

[4] "Permanent Legislative Service Agencies," published by the Council of State Governments.

less uniform laws dealing with all kinds of legal subjects, running all the way from the Uniform Commercial Code to the Uniform Simultaneous Death Law.[5]   It seems no less clear to me that a reasonable license tax can be imposed on the profession of being a lawyer, doctor, dentist, etc.   See *Royall* v. *Virginia,* 116 U. S. 572.   In these circumstances, wherein lies the unconstitutionality of what Wisconsin has done?   Does the Constitution forbid the payment of some part of the Constitutional license fee directly to the equally Constitutional state law revision commission?   Or is it that such a commission cannot be chosen by a majority vote of all the members of the state bar?   Or could it be that the Federal Constitution requires a separation of state powers according to which a state legislature can tax and set up commissions but a state judiciary cannot do these things?

I end as I began.   It is exceedingly regrettable that such specious contentions as appellant makes in this case should have resulted in putting the Integrated Bar under this cloud of partial unconstitutionality.

MR. JUSTICE WHITTAKER, concurring in result.

Believing that the State's requirement that a lawyer pay to its designee an annual fee of $15 as a condition of its grant, or of continuing its grant, to him of the *special privilege* (which is what it is) of practicing law in the State—which is really all that is involved here—does not violate any provision of the United States Constitution, I concur in the judgment.

MR. JUSTICE BLACK, dissenting.

I do not believe that either the bench, the bar or the litigants will know what has been decided in this case— certainly I do not.   Two members of the Court, saying

---

[5] In thirty-three States the legislature appoints Commissioners on Uniform State Laws.   Handbook of the National Conference of Commissioners on Uniform State Laws (1960), at p. 211.

that "the Constitutional issue is inescapably before us," vote to affirm the holding of the Wisconsin Supreme Court that a State can, without violating the Federal Constitution, compel lawyers over their protest to pay dues to be used in part for the support of legislation and causes they detest. Another member, apparently agreeing that the constitutional question is properly here, votes to affirm the holding of the Wisconsin Supreme Court because he believes that a State may constitutionally require a lawyer to pay a fee to its "designee" as a condition to granting him the *"special privilege"* of practicing law, even though that "designee," over the lawyer's protest, uses part of the fee to support causes the lawyer detests. Two other members of the Court vote to reverse the judgment of the Wisconsin court on the ground that the constitutional question is properly here and the powers conferred on the Wisconsin State Bar by the laws of that State violate the First and Fourteenth Amendments. Finally, four members of the Court vote to affirm on the ground that the constitutional question is actually not here for decision at all. Thus the only proposition in this case for which there is a majority is that the constitutional question is properly here, and the five members of the Court who make up that majority express their views on this constitutional question. Yet a minority of four refuses to pass on the question and it is therefore left completely up in the air—the Court decides nothing. If ever there were two cases that should be set over for reargument in order for the Court to decide—or at least to make an orderly attempt to decide—the basic constitutional question involved in both of them, it is this case and the companion case of *International Association of Machinists* v. *Street.*[1] In this state of affairs, I find it necessary to set out my views on the questions which I think are properly presented and argued by the parties.

[1] *Ante,* p. 740.

In my judgment, this Court cannot properly avoid decision of the single, sharply defined constitutional issue which this case presents. The appellant filed a complaint in a Wisconsin Circuit Court, charging that he is being compelled by the State of Wisconsin, as a prerequisite to maintaining his status as a lawyer in good standing, to be a member of an association known as the State Bar of Wisconsin and to pay dues to that association; that he has paid these dues only under protest; that the State Bar of Wisconsin is using his money along with the moneys it has collected from other Wisconsin lawyers to engage in activities of a political and propagandistic nature in favor of objectives to which he is opposed and against objectives which he favors; and that, as a consequence of this compelled financial support of political views to which he is personally antagonistic, he is being deprived of rights guaranteed to him by the First and Fourteenth Amendments of the Federal Constitution. Upon demurrer to this complaint, the Circuit Court held that it must be dismissed without leave to amend because, in the opinion of that court, "it would be impossible to frame a complaint so as to state facts sufficient to constitute a cause of action against either the State Bar of Wisconsin or the defendant Donohue." [2]

On appeal, the Supreme Court of Wisconsin, relying upon its powers of judicial notice, found as a fact that the State Bar does expend some of the moneys it collects as dues to further and oppose legislation [3] and that court

---

[2] The Circuit Court also found jurisdictional difficulties with appellant's complaint but it expressly declined to rest its decision upon the jurisdictional defects alone.

[3] "This court takes judicial notice of the activities of the State Bar in the legislative field since its creation by this court in 1956. In every instance the legislative measures advocated or opposed have dealt with the administration of justice, court reform, and legal practice." *Lathrop* v. *Donohue,* 10 Wis. 2d 230, 239, 102 N. W. 2d 404, 409. The scope of this finding is shown by the court's further

also accepted, at its full face value, the allegation of the complaint that many of these expenditures furthered views directly contrary to those held by the appellant.[4] The Wisconsin Supreme Court nevertheless affirmed the judgment of the trial court on the ground that the public interest in having "public expression of the views of a majority of the lawyers of the state, with respect to legislation affecting the administration of justice and the practice of law . . . far outweighs the slight inconvenience to," and hence any abridgment of the constitutional rights of, those who disagree with the views advocated by the State Bar.[5]

The plurality decision to affirm the judgment of the Wisconsin courts on the ground that the issue in the case is not "shaped . . . as leanly and as sharply as judicial judgment upon an exercise of . . . [state] power requires" is, in my judgment, wrong on at least two grounds. First of all, it completely denies the appellant an oppor-

statement in answer to appellant's contention that the State Bar also took positions on strictly substantive legislation: "We do not deem that the State Bar should be compelled to refrain from taking a stand on a measure which does substantially deal with legal practice and the administration of justice merely because it also makes some changes in substantive law." *Ibid.*

[4] Thus, the Wisconsin court correctly stated the issue in this case: "The only challenged interference with his liberty is the exaction of annual dues to the State Bar . . . part of which is used to advocate causes to which he is opposed." 10 Wis. 2d 230, 242, 102 N. W. 2d 404, 411.

[5] *Ibid.* The Wisconsin Supreme Court agreed with the Circuit Court that there were jurisdictional difficulties with the suit as it was brought. But the Supreme Court, like the Circuit Court, did not rest its decision on these jurisdictional grounds. Even though it agreed that the Circuit Court did not properly have jurisdiction, it expressly affirmed the judgment of the Circuit Court which, as pointed out above, dismissed the complaint without leave to amend on the ground that no amendment would cure the defects in the merits of appellant's case.

tunity to amend his complaint so as to "shape" the issue in a manner that would be acceptable to this Court. Appellant's complaint was dismissed by the Wisconsin courts, without giving him a chance to amend it and before he had an opportunity to bring out the facts in the case, solely because those courts believed that it would be impossible for him to allege any facts sufficient to entitle him to relief. The plurality now suggests, by implication, that the Wisconsin courts were wrong on this point and that appellant could possibly make out a case under his complaint. Why then is the case not remanded to the Wisconsin courts in order that the appellant will have at least one opportunity to meet this Court's fastidious pleading demands? The opinions of the Wisconsin courts in this case indicate that the laws of that State—as do the laws in most civilized jurisdictions—permit amendments and clarifications of complaints where defects exist in the original complaint which can be cured. And even if Wisconsin law were to the contrary, it is settled by the decisions of this Court that a federal right cannot be defeated merely on the ground that the original complaint contained a curable defect.[6] On this point, the judgment of the Court affirming the dismissal of appellant's suit, insofar as that judgment rests upon the plurality opinion, seems to me to be totally without justification, either in reason, in precedent or in justice.[7]

---

[6] See, e. g., Brown v. Western R. of Alabama, 338 U. S. 294, especially at 296.

[7] The authorities relied upon by the plurality opinion certainly do not support its position. The concurring opinion in United States v. C. I. O., 335 U. S. 106, 124–129, does not suggest that a litigant who fails properly to "shape" constitutional issues should be thrown out of court completely for his failure. And the decision of the Court in United States v. International Union, U. A. W.–C. I. O., 352 U. S. 567, plainly cannot be taken to justify such a disposition since that case was remanded for further proceedings.

My second ground of disagreement with the plurality opinion is that I think we should consider and decide now the constitutional issue raised in this case. No one has suggested that this is a contrived or hypothetical lawsuit. Indeed, we have it on no less authority than that of the Supreme Court of Wisconsin that the Wisconsin State Bar does in fact use money extracted from this appellant under color of law to engage in activities intended to influence legislation. The appellant has alleged, in a complaint sworn to under oath, that many of these activities are in opposition to the adoption of legislation which he favors. In such a situation, it seems to me to be nothing more than the emptiest formalism to suggest that the case cannot be decided because the appellant failed to allege, as precisely as four members of this Court think he should, what it is that the Bar does with which he disagrees. And it certainly seems unjust for the appellant to be thrown out of court completely without being given a chance to amend his complaint and for a judgment against him to be affirmed without consideration of the merits of his cause even though that judgment may later be held to constitute a complete bar to assertion of his First Amendment rights. Even if the complaint in this case had been drawn in rigid conformity to the meticulous requirements of the plurality, we would be presented with nothing but the very same question now before us: Can a State, consistently with the First and Fourteenth Amendments, force a person to support financially the activities of an organization in support of views to which he is opposed? Thus, the best, if not the only, reason I can think of for not resolving that question now is that a decision on the constitutional question in this case would make it impossible for the Court to rely upon the doctrine of avoidance with respect to that same constitutional

question to justify its strained interpretation of the Railway Labor Act in the *Street* case.[8]

On the merits, the question posed in this case is, in my judgment, identical to that posed to but avoided by the Court in the *Street* case. Thus, the same reasons that led me to conclude that it violates the First Amendment for a union to use dues compelled under a union-shop agreement to advocate views contrary to those advocated by the workers paying the dues under protest lead me to the conclusion that an integrated bar cannot take the money of protesting lawyers and use it to support causes they are against. What I have said in the *Street* case would be enough for me to dispose of the issues in this case were it not for the contention which has been urged by the appellee throughout this case that there are distinguishing features that would justify the affirmance of this case even if the statute in the *Street* case were struck down as unconstitutional.

The appellee's contention in this respect rests upon two different arguments. The first of these is that the use of compelled dues by an integrated bar to further legislative ends contrary to the wishes of some of its members can be upheld under the so-called "balancing test," which permits abridgment of First Amendment rights so long as that abridgment furthers some legitimate purpose of the State.[9] Under this theory, the appellee contends,

---

[8] As I have indicated in my dissenting opinion in that case, I also think the Court went to extravagant lengths to avoid the constitutional issue in that case. *Ante*, at 784–786. And I think it clear that the Court would have no choice but to meet and decide the constitutional issue in *Street* if a decision on that issue were made in this case. See *id.*, at 785.

[9] A complete statement of the arguments underlying the "balancing test" is set out in *American Communications Assn.* v. *Douds*, 339 U. S. 382, in which this Court held that the freedoms of speech, press,

abridgments of speech "incidental" to an integrated bar must be upheld because the integrated bar performs many valuable services for the public. As pointed out above, the Wisconsin Supreme Court embraced this theory in express terms. And the concurring opinion of MR. JUSTICE HARLAN, though not purporting to distinguish the *Street* case, also adopts the case-by-case "balancing" approach under which such a distinction as, indeed, any desired distinction is possible.

The "balancing" argument here is identical to that which has recently produced a long line of liberty-stifling decisions in the name of "self-preservation." [10] The interest of the State in having "public expression of the views of a majority of the lawyers" by compelling dissenters to pay money against their will to advocate views they detest is magnified to the point where it assumes overpowering proportions and appears to become almost as necessary a part of the fabric of our society as the need for "self-preservation." On the other side of the "scales," the interest of lawyers in being free from such state compulsion is first fragmentized into abstract, imaginary parts, then minimized part by part almost to the point of extinction, and finally characterized as being of a purely "chimerical nature." As is too often the case, when the cherished freedoms of the First Amendment emerge from this process, they are too weightless to have any substantial effect upon the constitutional scales and must therefore be sacrificed in order not to disturb what are conceived to be the more important interests of society.

I cannot agree that a contention arising from the abridgment of First Amendment freedoms which results

---

petition and assembly guaranteed by the First Amendment are outweighed by the power of Congress to regulate interstate commerce.

[10] See, *e. g., Dennis* v. *United States,* 341 U. S. 494, 509–511; *Barenblatt* v. *United States,* 360 U. S. 109, 127–128; *Wilkinson* v. *United States,* 365 U. S. 399, 411.

from compelled support of detested views can properly be characterized as of a "chimerical nature" or, in the words of the Wisconsin Supreme Court, as involving nothing more than a "slight inconvenience." [11] Quite the contrary, I can think of few plainer, more direct abridgments of the freedoms of the First Amendment than to compel persons to support candidates, parties, ideologies or causes that they are against. And, as stated many times before, I do not subscribe to the theory that abridgments of First Amendment freedoms can ever be permitted on a "balancing" basis.[12] I reiterate my belief that the unequivocal language of the First Amendment was intended to mean and does mean that the Framers of the Bill of Rights did all of the "balancing" that was to be.done in this area. It is my firm belief that, in the long run, the continued existence of liberty in this country depends upon the abandonment of the constitutional doctrine that permits this Court to reweigh the values weighed by the Framers and thus to weaken the protections of the Bill of Rights. This case reaffirms that belief for it shows that the balancing test cannot be and will not be contained to apply only to those "hard" cases which at least some members of this Court have regarded as involving the question of the power of this country to

[11] 10 Wis. 2d, at 242, 102 N. W. 2d 404, 411.

[12] See, e. g., Scales v. United States, ante, pp. 203, 259 (dissenting opinion); Communist Party v. Subversive Activities Control Board, ante, pp. 1, 137 (dissenting opinion); In re Anastaplo, 366 U. S. 82, 110–112 (dissenting opinion); Konigsberg v. State Bar of California, 366 U. S. 36, 62–71 (dissenting opinion); Braden v. United States, 365 U. S. 431, 441–446 (dissenting opinion); Wilkinson v. United States, 365 U. S. 399, 422–423 (dissenting opinion); Uphaus v. Wyman, 364 U. S. 388, 392–393 (dissenting opinion); Barenblatt v. United States, 360 U. S. 109, 140–144 (dissenting opinion); American Communications Assn. v. Douds, 339 U. S. 382, 445–453 (dissenting opinion).

preserve itself. For I assume that no one would argue that the power at stake here is necessary to that end.

Moreover, if I felt that I had the power to reweigh the "competing" values involved, I would have no difficulty reaching the conclusion that the loss inflicted upon our free way of life by invasion of First Amendment freedoms brought about by the powers conferred upon the Wisconsin integrated bar far outweighs any state interest served by the exercise of those powers by that association. At stake here is the interest of the individual lawyers of Wisconsin in having full freedom to think their own thoughts, speak their own minds, support their own causes and wholeheartedly fight whatever they are against, as well as the interest of the people of Wisconsin and, to a lesser extent, the people of the entire country in maintaining the political independence of Wisconsin lawyers.[13] How is it possible that such formidable interests so vital to our free way of life can be said to be outweighed by any interest—much less the wholly imaginary interest urged here by the State which would have us believe that it will never know what its lawyers think about certain political questions if it cannot compel them to pay their money to support views they abhor? Certainly, I feel entirely confident in saying that the Framers of the First Amendment would never have struck the balance against freedom on the basis of such a demonstrably specious expediency.

In saying all this, I do not mean to suggest that the Wisconsin State Bar does not provide many useful and entirely lawful services. Quite the contrary, the record indicates that this integrated bar association, like other

---

[13] Cf. *Cohen* v. *Hurley*, 366 U. S. 117, 138–150 (dissenting opinion); *In re Anastaplo*, 366 U. S. 82, 114–116 (dissenting opinion); *Konigsberg* v. *State Bar of California*, 366 U. S. 36, 73–74, 77–80 (dissenting opinion).

bar associations both integrated and voluntary, does provide such services. But I think it clear that these aspects of the Wisconsin State Bar are quite beside the point so far as this case is concerned. For a State can certainly insure that the members of its bar will provide any useful and proper services it desires without creating an association with power to compel members of the bar to pay money to support views to which they are opposed or to fight views they favor. Thus, the power of a bar association to advocate legislation at the expense of those who oppose such legislation is wholly separable from any legitimate function of an involuntary bar association and, therefore, even for those who subscribe to the balancing test, there is nothing to balance against this invasion of constitutionally protected rights.

The second ground upon which the appellee would have us distinguish compelled support of hated views as practiced by an integrated bar from compelled support of such views as practiced by the unions involved in the *Street* case is that lawyers are somehow different from other people. This argument, though phrased in various ways, amounts to nothing more than the contention that the practice of law is a high office in our society which is conferred by the State as a privilege and that the State can, in return for this privilege, impose obligations upon lawyers that it could not impose upon those not given "so high a privilege." Were it not for this Court's recent decision in *Cohen* v. *Hurley*,[14] I would regard this

---

[14] 366 U. S. 117. The decision of the New York Court of Appeals in that case was expressly rested in part upon the notion that the practice of law is a "special privilege." See *id.*, at 132–133 (dissenting opinion). And I thought then, as I think now, that the decision of this Court upholding the judgment of the New York court placed "the stamp of approval upon a doctrine that, if permitted to grow, as doctrines have a habit of doing, can go far toward destroying the independence of the legal profession and thus toward rendering that pro-

contention as utterly frivolous. But, it is true that the Court did hold in the *Cohen* case that lawyers could be treated differently from other people, at least insofar as a constitutional privilege against self-incrimination is concerned. As I pointed out in my dissenting opinion in that case, it is a short step from that position to the position now urged in the concurring opinion of MR. JUSTICE WHITTAKER—that lawyers must also give up their constitutional rights under the First Amendment in return for the "privilege" that the State has conferred upon them.[15]

I do not believe that the practice of law is a "privilege" which empowers Government to deny lawyers their constitutional rights. The mere fact that a lawyer has important responsibilities in society does not require or even permit the State to deprive him of those protections of freedom set out in the Bill of Rights for the precise purpose of insuring the independence of the individual against the Government and those acting for the Government. What I said in the *Cohen* case is, in my judgment, equally applicable here:

". . . [O]ne of the great purposes underlying the grant of those freedoms was to give independence to those who must discharge important public responsibilities. The legal profession, with responsibilities as great as those placed upon any group in our society, must have that independence. If it is denied them, they are likely to become nothing more than parrots of the views of whatever group wields governmental power at the moment. Wherever that has happened in the world, the lawyer, as properly so called and respected, has ceased to perform the highest duty of

---

fession largely incapable of performing the very kinds of services for the public that most justify its existence." *Id.*, at 135 (dissenting opinion).

[15] *Id.*, at 142–143 (dissenting opinion).

his calling and has lost the affection and even the respect of the people." [16]

As I see it, the single, sharply defined constitutional issue presented in this case does not raise a difficult problem. This appellant is not denying the power of the State of Wisconsin to provide that its bar shall engage in non-political and non-controversial activities or even the power of the State to provide that all lawyers shall pay a fee to support such activities. What he does argue, and properly I think, is that the State cannot compel him to pay his money to further the views of a majority or any other controlling percentage of the Wisconsin State Bar when that controlling group is trying to pass laws or advance political causes that he is against. If the "privilege" of being a lawyer renders that argument unsound, it is certainly one of the more burdensome privileges Government can confer upon one of its citizens. And lawyers might be well advised to reconsider the wisdom of encouraging the use of a slogan which, though high-sounding and noble in its outward appearance, apparently imposes heavy burdens upon their First Amendment freedoms.

I would reverse this case and direct the Supreme Court of Wisconsin to require refund of the dues exacted under protest from the appellant in order to permit the Wisconsin State Bar to advocate measures he is against and to oppose measures he favors. I think it plain that lawyers have at least as much protection from such compulsion under the Constitution as the Court is holding railroad workers have under the Railway Labor Act.

Mr. Justice Douglas, dissenting.

The question in the present case concerns the power of a State to compel lawyers to belong to a statewide

---

[16] *Id.*, at 138–139 (dissenting opinion).

bar association, the organization commonly referred to in this country as the "integrated bar." There can be no doubt that lawyers, like doctors and dentists, can be required to pass examinations that test their character and their fitness to practice the profession. No question of that nature is presented. There is also no doubt that a State for cause shown can deprive a lawyer of his license. No question of that kind is involved in the present case.[1] The sole question is the extent of the power of a State over a lawyer who rebels at becoming a member of the integrated bar and paying dues to support activities that are offensive to him. Thus the First Amendment, made applicable to the States by the Fourteenth, is brought into play. And for the reasons stated by MR. JUSTICE BLACK, I think all issues in the case are ripe for decision.

If the State can compel all lawyers to join a guild, I see no reason why it cannot make the same requirement of doctors, dentists, and nurses. They too have responsibilities to the public; and they also have interests beyond making a living. The groups whose activities are or may be deemed affected with a public interest are indeed numerous. Teachers are an obvious example. Insurance agents, brokers, and pharmacists have long been under licensing requirements or supervisory regimes. As the interdependency of each person on the other increases with the complexities of modern society, the circle of people performing vital services increases. Precedents once established often gain momentum by the force of their existence. Doctrine has a habit of following the path of inexorable logic.

---

[1] A self-policing provision whereby lawyers were given the power to investigate and disbar their associates would raise under most, if not all, state constitutions the type of problem presented in *Schechter Corp.* v. *United States,* 295 U. S. 495. See 1 Davis, Administrative Law Treatise, § 2.14.

We established no such precedent in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225. We dealt there only with a problem in collective bargaining, *viz.,* is it beyond legislative competence to require all who benefit from the process of collective bargaining and enjoy its fruits to contribute to its costs? We held that the evil of those who are "free riders" may be so disruptive of labor relations and therefore so fraught with danger to the movement of commerce that Congress has the power to permit a union-shop agreement that exacts from each beneficiary his share of the cost of getting increased wages and improved working conditions. The power of a State to manage its internal affairs by requiring a union-shop agreement would seem to be as great.

In the *Hanson* case we said, to be sure, that if a lawyer could be required to join an integrated bar, an employee could be compelled to join a union shop. But on reflection the analogy fails.

Of course any group purports to serve a group cause. A medical association that fights socialized medicine protects the fees of the profession. Yet not even an immediate cause of that character is served by the integrated bar. Its contribution is in policing the members of the legal profession and in promoting what the majority of the Bar thinks is desirable legislation.

The Supreme Court of Wisconsin said that the integrated bar, unlike a voluntary bar association, was confined in its legislative activities. Though the Wisconsin Bar was active in the legislative field, it was restricted to administration of justice, court reform, and legal practice. The court however added:

> "The plaintiff complains that certain proposed legislation, upon which the State Bar has taken a stand, embody changes in substantive law, and points to the recently enacted Family Code. Among other things, such measure made many changes in divorce

procedure, and, therefore, legal practice. We do not deem that the State Bar should be compelled to refrain from taking a stand on a measure which does substantially deal with legal practice and the administration of justice merely because it also makes some changes in substantive law." 10 Wis. 2d 230, 239, 102 N. W. 2d 404, 409.

It is difficult for me to see how the State can compel even that degree of subservience of the individual to the group.

It is true that one of the purposes of the State Bar Association is "to safeguard the proper professional interests of the members of the bar." State Bar of Wisconsin, Rule 1, § 2. In this connection, the association has been active in exploiting the monopoly position given by the licensed character of the profession. Thus, the Bar has compiled and published a schedule of recommended minimum fees. See Wis. Bar Bull., Aug. 1960, p. 40. Along the same line, the Committee on Unauthorized Practice of the Law, along with a Committee on Inter-professional and Business Relations, has been set up to police activities by nonprofessionals within "the proper scope of the practice of law." State Bar of Wisconsin, By-Laws, Art. IV, §§ 8, 11.

Yet this is a far cry from the history which stood behind the decision of Congress to foster the well-established institution of collective bargaining as one of the means of preserving industrial peace. That history is partially crystallized in the language of the Wagner and Taft-Hartley Acts: "Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce . . . by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and em-

ployees." National Labor Relations Act, as amended by the Taft-Hartley Act, 61 Stat. 136, 137, 29 U. S. C. § 151. It was with this history in mind that we spoke when we said that "One would have to be blind to history to assert that trade unionism did not enhance and strengthen the right to work." *Railway Employes' Dept.* v. *Hanson, supra,* 235.

Nor can the present association be defended on grounds that it renders only public services.

If we had here a law which required lawyers to contribute to a fund out of which clients would be paid in case attorneys turned out to be embezzlers,[2] the present objection might not be relevant. In that case, one risk of the profession would be distributed among all members of the group. The fact that a dissident member did not feel he had within him the seeds of an embezzler might not bar a levy on the whole profession for one sad but notorious risk of the profession. We would also have a different case if lawyers were assessed to raise money to finance the defense of indigents. Cf. *In re Florida Bar,* 62 So. 2d 20, 24. That would be an imposition of a duty on the calling which partook of service to the public. Here the objection strikes deeper. An attorney objects to a forced association with a group that demands his money for the promotion of causes with which he disagrees, from which he obtains no gain, and which is not part and parcel of service owing litigants or courts.

The right of association is an important incident of First Amendment rights. The right to belong—or not to

---

[2] See 84 Rep. Am. Bar Assn., pp. 365–367, 513–515, 604–606 (1959); Voorhees, A Progress Report: The Clients' Security Fund Program, 46 Am. Bar Assn. Jour., 496 (1960); Voorhees, Should The Bar Adopt Client Security Funds?, 28 Jour. Bar Assn. Kan. 5 (1959). As of May 1961, Arizona, Colorado, Connecticut, New Hampshire, New Mexico, Ohio, Pennsylvania, and Washington have such funds.

belong—is deep in the American tradition. Joining is one method of expression. This freedom of association is not an absolute. For as I have noted in my opinion in *International Assn. of Machinists* v. *Street, ante,* p. 775, decided this day, the necessities of life put us into relations with others that may be undesirable or even abhorrent, if individual standards were to obtain. Yet if this right is to be curtailed by law, if the individual is to be compelled to associate with others in a common cause, then I think exceptional circumstances should be shown. I would treat laws of this character like any that touch on First Amendment rights. Congestion of traffic, street fights, riots and such may justify curtailment of opportunities or occasions to speak freely. Cf. *Chaplinsky* v. *New Hampshire,* 315 U. S. 568. But when those laws are sustained, we require them to be "narrowly drawn" (*Cantwell* v. *Connecticut,* 310 U. S. 296, 311) so as to be confined to the precise evil within the competence of the legislature. See *Shelton* v. *Tucker,* 364 U. S. 479; *Louisiana* v. *N. A. A. C. P.,* 366 U. S. 293. There is here no evil shown. It has the mark of "a lawyer class or caste"—the system of "a self-governing and self-disciplining bar" such as England has.[3] The pattern of this legislation is regimentation. The inroads of an integrated bar on the liberty and freedom of lawyers to espouse such causes as they choose was emphasized by William D. Guthrie[4] of the New York Bar: [5]

> "The idea seems to be, contrary to all human experience, that if power be vested in this at present unknown and untried as well as indifferent outside body, holding themselves aloof from their profession, they will somehow become inspired with a high pro-

[3] Guthrie, The Proposed Compulsory Incorporation of the Bar, 4 N. Y. L. Rev. 223, 231 (1926).

[4] See Swaine, The Cravath Firm (1946), Vol. I, pp. 359, 518.

[5] Guthrie, *supra,* note 3, 234–235.

fessional sentiment or sense of duty and cooperation and will unselfishly exercise their majority power for the good of their profession and the public, that they can be trusted to choose as their officers and leaders lawyers of the type who are now leaders, that the responsibility of power will necessarily sober and elevate their minds, and finally that democracy calls for the rule of the majority.

"Thus, the traditions and ethics of our great profession would be left to the mercy of mere numbers officially authorized to speak for us! This would be adopting all the vices of democracy without the reasonable hope in common sense of securing any of its virtues. It would be forcing the democratic dogma of mass or majority rule to a dangerous and pernicious extreme.

"Although in political democracy the rule of the majority is necessary, the American system of democracy is based upon the recognition of the imperative necessity of limitations upon the will of the majority. In the proposed compulsory or involuntary incorporation of the bar, there would be no limitation whatever, and the best sentiments and traditions of the profession, of the public-spirited and high-minded lawyers who are now active in the voluntary bar associations of the state, could be wholly and wantonly disregarded and overruled." [6]

This regimentation appears in humble form today. Yet we know that the Bar and Bench do not move to a single

---

[6] Compare with this the language of the court below in this case: "[I]t promotes the public interest to have public expression of the views of a majority of the lawyers of the state, with respect to legislation affecting the administration of justice and the practice of law, the same to be voiced through their own democratically chosen representatives comprising the board of governors of the [Integrated] State Bar." 10 Wis. 2d 230, 242, 102 N. W. 2d 404.

"nonpartisan" objective. The obvious fact that they are not so motivated is plain from *Cohen* v. *Hurley,* 366 U. S. 117, which we decided only the other day. Once we approve this measure, we sanction a device where men and women in almost any profession or calling can be at least partially regimented behind causes which they oppose. I look on the *Hanson* case as a narrow exception to be closely confined. Unless we so treat it, we practically give *carte blanche* to any legislature to put at least professional people into goose-stepping brigades.[7]

[7] A current observer has commented on the results of the regimented Bar in England:

"Britain is moving towards a dangerous dictatorship not only in journalism, wireless, and television, but in finance and law. The immense groups controlling financial operations are becoming more and more interlocked and have an increasing tendency to cover up each other's errors.

"The great firms of solicitors are less and less inclined to offend the powerful financial houses which place the biggest business; and if dishonesty is alleged they all too often refuse 'to act' if this should involve one of the great interests upon which the big and profitable business of our times depends.

"Slowly, dangerously, and without the public fully realising what is happening, a nation of great power bottled up in a tiny geographical area is being brought within the grip of a minority of extremely powerful men whose genius is to deny the smallest pretension to power, but who, in fact, are wholly ruthless in a persistent search for power.

"In this search, although money is vital, they are ready to be Radical in many ways—particularly in the destruction of all rivalry for influence which might spring from a widespread continuity of wealth in the hands of proprietors of family businesses or land.

.    .    .    .    .

"To destroy this movement towards Press monopoly and financial 'cover-up,' it will be necessary for individuals still preserved from 'take-over' to support every form of independent journalism and finance. Unhappily, in the field of journalism the smaller groups are so afraid of worse than already threatens, that the tendency is towards surrender. This must be stopped." The Weekly Review, Feb. 3, 1961, pp. 1, 2.

Those brigades are not compatible with the First Amendment. While the legislature has few limits where strictly social legislation is concerned (*Giboney* v. *Empire Storage Co.,* 336 U. S. 490; *Tot* v. *United States,* 319 U. S. 463), the First Amendment applies strictures designed to keep our society from becoming moulded into patterns of conformity which satisfy the majority.