Vincente **GALVAN** and **Marcelino Torres**, Plaintiffs,

v.

**Louis K. LEVINE, Industrial Commissioner of the State of New York, Defendant.**

**No. 70 Civ. 2019.**

United States District Court, S. D. New York.

July 5, 1972.

John DeWitt Gregory, Oscar G. Chase and Robert Roberts, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, by Brenda Soloff, Asst. Atty. Gen., for defendant.

Before FEINBERG, Circuit Judge, and TYLER and POLLACK, District Judges.

## OPINION

TYLER, District Judge.

Following the last hearing in this case before the statutory court and the subsequent memorandum thereof dated February 15, 1972, counsel for the parties responded with a stipulation, by the terms of which they elected to have this court decide their motion and cross motion, respectively, for summary judgment on the basis of the present record, including documents and transcripts of examinations before trial.

By various interstate agreements, New York State unemployment benefits may be collected by a claimant who has moved away from New York. Every claimant's eligibility for unemployment insurance benefits is partially determined by the New York Labor Law,

McKinney's Consol.Laws, c. 31, § 591 which provides in pertinent part as follows:

"1. Unemployment. Benefits shall be paid only to a claimant who is totally unemployed and who is unable to engage in his usual employment or in any other for which he is reasonably fitted by training and experience.

2. Availability and capability. No benefits shall be payable to any claimant who is not capable of work or who is not ready, willing and able to work in his usual employment· or in any other for which he is reasonably fitted by training and experience."

Pursuant to § 591, for many years the policy of the Commissioner has been that benefits are not paid to a claimant who: (1) leaves the labor market area in which he was last employed, and (2) moves his residence to another labor market area where there are no reasonable opportunities of obtaining work for which he is qualified by training and experience. The policy is founded on the determination that a person who insulates himself from any reasonable opportunity of employment is not truly available for work within the meaning of § 591(2).

Beginning in late 1967, following a series of decisions of the New York State Department of Labor Unemployment Insurance Appeal Board,* the defendant, who is charged with administering the Unemployment Insurance Law, and his agents decided that a claimant's removal to an area of "high persistent unemployment" was convincing evidence that he had moved to an area where there was no reasonable opportunity of obtaining work. Accordingly, unless he possesses an occupational skill for which there is a particular demand, such a claimant is now deemed unavailable for work and denied benefits. Important to the implementation of this policy, as will be seen *infra*, is the definition of "high

persistent unemployment" adopted and used by defendant and his agents.

Plaintiffs have never claimed that any New York statute as such is in violation of the federal Constitution or federal statutory law. As the briefs and the present record indicate, plaintiffs, after full discovery to their satisfaction, no longer make any claim that the policy of the Commissioner set out above is unconstitutional. Rather, they challenge the defendant's definition of an area of "high persistent unemployment" as one having a current unemployment rate of twelve percent or more. Specifically, plaintiffs argue that the "twelve percent rule" and its use by state officials violates the equal protection clause of the Fourteenth Amendment because it: (1) intentionally discriminates against Puerto Rican Americans in that it was promulgated to apply, and does apply, only to Puerto Rico, and not to other areas of twelve percent unemployment; (2) has been arbitrarily and intentionally applied to Puerto Rican claimants and no other claimants; and (3) has a dramatic discriminatory impact upon Puerto Rican claimants.

Because of the apparently substantial constitutional questions raised, see the memorandum dated September 3, 1970 filed by the writer, a three judge court was convened to hear and determine this controversy. Since that time, and after the last hearing in this case on February 15, 1972, this statutory court, on its own initiative, has had occasion to reconsider whether the issues presented on these cross motions for summary judgment should be heard before a single judge or a three judge panel pursuant to 28 U.S.C. § 2281.[1] Passing for the moment the comments of those critics of the three judge court statute to the effect that it represents a potential trap for unwary litigants and an unnecessary burden on the administration of the federal courts, e. g. Comment, The Three Judge Federal Court in Constitutional

---

* AB #125,842; 145,076; 147,282.

1. The parties to this litigation have not addressed themselves to this question.

Litigation: A Procedural Anachronism, 1960, 27 U.Chi.L.Rev. 555; suffice it to say that this case presents an excellent example of the conceptual and technical problems which the statute engenders. As it did earlier with regard to the statewide policy of the Commissioner, this court assumes for present purposes that the twelve percent rule which is an extension of that policy, is a "legislative action" in character to which the state has given its sanction, thus making the rule a "statute" within the meaning of 28 U.S.C. § 2281. cf. Lathrop v. Donohue, 367 U.S. 820, 824–827, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (court order integrating state bar a "statute" within 28 U.S.C. § 1257); see A.F. of L. v. Watson, 327 U.S. 582, 592–593, 66 S. Ct. 761, 90 L.Ed. 873 (1945); Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 292, 43 S.Ct. 353, 67 L.Ed. 659 (1923); Law Students Civil Rights Research Coun., Inc. v. Wadmond, 299 F.Supp. 117 (S.D.N.Y., 1969), aff'd 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1970). It is true that in adopting the twelve percent rule to enforce the provisions of § 591, the Commissioner was not acting under a specific delegation of authority by the legislature. As was stated in Lathrop v. Donohue, however, "the absence of such a delegation does not preclude consideration of the exercise of authority as a statute." *supra*, 367 U.S. at 825, 81 S.Ct. at 1828. It is clear that the Commissioner was acting under a state statute, and that the broad provisions of § 591 had to be given specific meaning and content by the Commissioner. As such, the Commissioner's rule regulates eligibility benefits for unemployment insurance benefits and has all the characteristics of legislation.

 Plaintiff's contentions that the twelve percent rule is itself unconstitutional in that it was promulgated with discriminatory intent and has a discriminatory impact must be decided by a three judge court. The third claim of plaintiffs that the twelve percent rule is applied or administered in a discriminatory fashion does not require a ruling on the constitutionality of the "statute" and could therefore be heard by a single judge. See Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941); Wright, Federal Courts 190 (2d ed., 1970). Recent decisions of the Supreme Court have, however, upheld the authority of a three judge court to hear non-constitutional claims affecting the validity of a statute also attacked on constitutional grounds. See Florida Lime & Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Although *Jacobsen* and *Wyman* involved statutory and constitutional attacks on a state statute, the principle of pendent jurisdiction is equally applicable to the three attacks on this statute. Reasons of judicial efficiency dictate such an approach in the present case, where all three judges have heard the entire case, especially since all three claims presented by plaintiffs derive from a common nucleus of operative facts. cf. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Additionally, resolution of the discriminatory application claim by a single judge and of the two constitutional claims by a three judge panel might result in two separate appeals, one to the Supreme Court and the other to the Court of Appeals. See, generally, Law Students Civil Rights Research Coun., Inc. v. Wadmond, *supra*. In any event, where the three judge court has heard the entire case, "sound policy" warrants the three judge panel, in its discretion, to decide the related issue over which jurisdiction is at most debatable. See Law Students Civil Rights Research Coun., Inc. v. Wadmond, *supra*, 299 F.Supp. at 129.

 Plaintiffs have also attacked the validity of the twelve percent rule under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. Although a three judge court can entertain an attack on a state statute upon federal statutory and constitutional grounds, Rosado v. Wyman, *supra*, the statutory claim

should be decided first and, for reasons of judicial economy, probably by a single judge. Wyman v. Rothstein, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970); Rosado v. Wyman, *supra.* Here, however, decision on the statutory claim practically requires resolution of the constitutional issues or claims. Since the primary reason for adoption of the three judge court statute was to create a "court of special dignity" to hear constitutional attacks on state laws, Wright, Federal Courts 188 (2d ed., 1970), it would be anomalous for a single judge to decide the constitutional issues under the guise of deciding the statutory claim. It would also be an empty gesture for this three judge court to decide the statutory claim first. The statutory claim was added by amendment of the complaint on December 3, 1971, many months after this court was convened and had considered the substantial constitutional claims. Also, for the most part, Title VI merely reiterates the obligations imposed by the Fourteenth Amendment. Withal, it serves no useful purpose to refrain from first reaching the constitutional issues. Thus, we resolve as a statutory court to decide first the non-statutory issues in this case. In this connection, we refer to previous findings of fact in this case, see Galvan v. Catherwood, 324 F.Supp. 1016 (S.D.N.Y., 1971), and proceed to additional findings necessary to resolve these issues.

As stated, it is the adoption of the twelve percent rule and its implementation since December, 1967 of which plaintiffs complain.

As the following chart indicates, approximately 20,000 Puerto Rican American claimants for unemployment insurance benefits were disqualified from receiving such benefits under the aforementioned rule in the two years for which figures are available. The chart below which is compiled from defendant's records indicates all claims filed from Puerto Rico from 1965 through 1969, the number granted and denied and the number denied because the claimant was "unavailable" for employment:

| Year | Total Claims | Granted | Denied | Den. for Unavail'ty | % of Total Clms. Den. | % of Total Claims Den. for Unavail'ty |
|------|------|------|------|------|------|------|
| 1965 | 23,003 | 17,670 | 5,333 | unknown | 23% | ---- |
| 1966 | 24,680 | 19,353 | 5,328 | unknown | 22% | ---- |
| 1967 | 26,138 | 20,100 | 6,038 | unknown | 23% | ---- |
| 1968 | 31,095 | 17,398 | 13,697 | 9,169 | 44% | 29% |
| 1969 | 25,862 | 10,754 | 14,108 | 10,145 | 54% | 39% |

In 1968, which was the first year of the twelve percent rule's operation, denials of unemployment insurance benefits rose from 6,038 in 1967 to 13,697. The figure increased in 1969 to 14,108, notwithstanding a decrease in the total number of applications. That these increases in denials were a result of the twelve percent rule is not denied by defendant's witnesses. See depositions of Edward J. Bruso and Karel Ficek.

Application and operation of the twelve percent rule in Puerto Rico for Puerto Rican American claimants is to be contrasted with the record of claims by claimants within the State of New York and other parts of the continental United States. Without extensive discussion, it should be noted that from December, 1967, the effective date of the twelve percent rule, the Industrial Commissioner's office has not denied benefits to a claimant who has moved to any other area of the continental United States, save for two claimants, a married couple, filing from Santa Cruz, California in 1970. This is so even though there are 108,745 claims indicated by the record as being received from persons

moving to other out-of-New York areas in 1968 and 1969. This excludes, of course, the unknown number of claims from such claimants during the years 1970 and 1971. It also excludes the unknown number of claims received from persons moving to areas outside of New York City but within the State of New York during the entire period from December, 1967 to date.

It seems clear, therefore, that the adoption and implementation of the so-called twelve percent rule has had an effect clearly adverse to Puerto Rican Americans who travel from New York to Puerto Rico seeking employment. Further, there is clear evidence that the twelve percent rule has not been applied consistently or even substantially to claimants who have traveled from New York to other areas of the continental United States which might be regarded as areas of high persistent unemployment. In applying the high persistent unemployment policy to interstate claims from all areas, the Out-of-State Resident Office has attempted to identify areas of high persistent unemployment only among the relatively few out-of-state areas of "persistent unemployment" which are included in the *Area Trends* listing of "150 Major Labor Areas" (140 outside of New York and Puerto Rico), and for which the periodical provides monthly unemployment rates. By regular review of *Area Trends* since the inception of the policy, the Office has determined that none of these areas has had a current unemployment rate as high as the Office's prevailing current unemployment rate criteria.[2] See deposition of Edward J. Bruso. *Area Trends* regularly lists over 400 non-Puerto Rican out-of-state areas of persistent unemployment under the federal definition, although it does not provide current unemployment rates for these areas. As

in the case of Puerto Rican areas, the statistical data relevant to the Out-of-State Resident Office's criteria of high persistent unemployment, when not provided by *Area Trends,* is generally available for other out-of-state areas from local sources. The Office does not attempt to obtain the relevant data for claims from non-Puerto Rican areas of persistent unemployment reported in *Area Trends* without unemployment rates or for areas not mentioned in *Area Trends* and about which, therefore, nothing is known. Thus, defendant's agents have ignored these 400 plus areas in checking unemployment rates, notwithstanding that figures readily available to them have indicated a possibility that the twelve percent rule should be applied to some of these 400 plus areas. Instead, in respect to all claims from areas other than Puerto Rico, the Out-of-State Resident Office has continued to rely upon, and accept as determinative of a claimant's availability under the policy, affirmative responses by out-of-state claims examiners that the applicant has a "reasonable opportunity for employment."[3] In contrast, unemployment rates for every hamlet in Puerto Rico are checked—whether or not those communities are listed in *Area Trends.* An affirmative response to the "reasonable opportunity for work" standard by examiners in Puerto Rico is no longer accepted. Thus, the arbitrary scrutiny of only Puerto Rican communities has resulted in another inequity, i. e. the use of the twelve percent rule in Puerto Rico and the use of a "reasonable opportunity for work" standard in the continental United States.

Furthermore, there exist in New York State areas which would meet the criteria of high persistent unemployment or twelve percent unemployment applied to out-of-state areas. But the twelve per-

---

2. This excludes, however, two of the three cities in Puerto Rico which are listed among the 150 major labor areas, and which have twelve percent rates of unemployment.

3. This standard of "reasonable opportunity for employment" was used by the defendant for all areas, including Puerto Rico, prior to the implementation of the twelve percent rule, and will be discussed in more detail later in this opinion.

cent rule has never been applied to any claimant moving to an area within New York State. Rather, the reasonable opportunity for work standard has been applied to such cases. True, there is no proof in the record that any claimant moved to such a twelve percent area within New York State. Nor, as defendant points out, is there proof that any of the 108,745 claimants, heretofore indicated and whose claims were not denied, moved to an area of twelve percent unemployment. But these points do not rectify the dominant problem in this case: aside from the 150 major labor markets listed in *Area Trends* which contain current unemployment rates, no effort has been made to obtain and closely scrutinize unemployment rates for other areas of "persistent unemployment" except in Puerto Rico, with the result that the twelve percent rule has not been applied to areas other than those in Puerto Rico.[4] Put differently, defendant's agents in passing upon claims of non-Puerto Ricans, have not attempted to find out if the twelve percent rule applied but, rather, have relied on the reasonable opportunity for work standard. Thus, the net of all this is, as shown by the table set out earlier in this memorandum, a clear picture of discriminatory application of the twelve percent rule to Puerto Rican Americans traveling to Puerto Rico.[5]

As defendant argues and plaintiffs effectively concede, there is no clear evidence that the adoption of the rule and its implementation constituted "witting" or blatant racial prejudice by defendant or other agents of the Department of Labor of the State of New York. But plaintiffs argue that the inescapable inference to be drawn from the record is that the twelve percent rule was meant to apply only to Puerto Rico and not to other areas of twelve percent unemployment. Defendant's witnesses virtually admitted that the rule was adopted by the Department of Labor due to the undeniable fact that more Puerto Rican Americans settle and seek job opportunities in New York City than in any other area of the continental United States. At the time the twelve percent rule was adopted, the Department of Labor was aware that it would eliminate applicants from Puerto Rico. See Ficek Deposition, p. 21. And, in the first Appeal Board case which affirmed the use of the rule, the Board noted:

> "The cases hereunder reviewed are typical of a great many cases . . . involving the eligibility of claimants . . . having removed themselves from the New York area in which they were previously employed to the Commonwealth of Puerto Rico." Appeal Board Dec., 145–076, p. 3. Exhibit E of Complaint.

These circumstances and other evidence heretofore discussed, in our view, sufficiently suggest a pattern of racial discrimination calling for the "most rigid scrutiny." Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944). The burden of proof is on defendant to show that the twelve percent rule as conceived and applied, with its corollary discriminatory impact, is "necessary to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate." See Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967).

The twelve percent rule was adopted in December, 1967, even though the Division of Employment, which ordinarily

---

4. The one exception to this, of course, is the couple in Santa Cruz, California.

5. Defendant's counsel recently called to our attention that as of January 14, 1972, Seattle, Washington, one of the 150 major labor areas, was designated as an area of twelve percent unemployment. If the point is that we should accept this as evidence that defendant's agents are applying the rule elsewhere than Puerto Rico, we decline to do so because (1) heretofore defendant has always checked the 150 areas, but (2) there is no evidence that the rule has been applied to Seattle cases.

decided benefit eligibility policy, was quite satisfied with the pre-existing policy. See testimony of Karel Ficek, Director of Employment Security Research for the Division of the New York State Department of Labor. Briefly, the former policy and method of implementation thereof was usage of the Rules set forth in the Interstate Claim Supplement. In particular, reliance was put upon Question 11 of that Supplement designed to determine whether a claimant had a reasonable opportunity of finding employment in the area to which he had moved. The simple purpose of the old policy was to objectively make as precise a determination as possible whether or not the claimant was showing a sincere, concentrated and substantial effort to locate work within the area to which he had moved—and this within his capabilities and experience. In other words, the old policy represented a proper case by case attempt to fulfill New York's long standing policy under § 591 (in particular, subdivision (2) thereof) of the Labor Law requiring that claimants not move to areas where there is "no reasonable opportunity" to find jobs. This former policy, as heretofore found, is still used in the continental United States. The record indicates, thus, the anomalous situation that these persons most directly connected with implementation of the New York Labor Law and the payment of unemployment insurance benefits were by no means dissatisfied with the policy or rules existing prior to the advent of the so-called twelve percent rule. As the witnesses have indicated, the twelve percent rule stems from a decision of the Unemployment insurance Appeal Board, No. 125–842. Briefly stated, the holding of the Board was that where there is a high level of unemployment in the relevant labor market area, the claimant *ipso facto* is ineligible so long as the unemployment level was over a stated percentage.

With this state of the record, we cannot conclude that the twelve percent rule has been properly applied to accomplish a permissible state objective. Defendant argues that the twelve percent rule implements the "compelling state need of paying only persons who become and who remain unemployed through no fault of their own, persons who are available for work." We accept the state need but consider the twelve percent rule as implemented to be a constitutionally impermissible method of meeting it.[6] Further, we have found that the pre-December, 1967 policy of New York achieved the State's needs and objectives under § 591 without constitutionally impermissible effects.

█ We hold, therefore, that the twelve percent rule, as applied by defendant to implement Section 591 of the Labor Law, violates Title VI of the Civil Rights Act of 1968 and the Fourteenth Amendment. We emphasize, however, that our holding does not forbid the state from implementing the twelve percent rule so long as it applies that policy evenly to claimants from each of the 50 states, the Commonwealth and the territories. Settle order and judgment on notice accordingly.

FEINBERG, Circuit Judge, and POLLACK, District Judge, concur.

6. Counsel have focused their arguments on the constitutionality of a twelve percent rule, *qua* rule resulting in a bare statistical impact on a particular racial group; see Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir., 1972), and as to the appropriate standard of validation in such a hypothetical case. We have not addressed ourselves to these questions because it is clear that the twelve percent rule has been applied in an invidious manner, necessarily resulting in an adverse racial effect. In light of this fact, we decline the invitation to decide if the twelve percent rule has an impact along the lines of those cases such as *Chance, supra,* and, if so, whether the rule can be validated under the appropriate standard of review.